IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Jeremy Paul Batts and Susan      )
Bett Batts as Co-personal        )
Representatives of the Estate    )
of Kaiea Spring Batts,           )
deceased,                        )
                 Plaintiff,      )
          vs.                    )  2:23cv3565-DCN
                                 )
Snap Inc d/b/a Snapchat,         )
INC., Evan Spiegel and Emily     )
White,                           )
                 Defendant.      )  June 20, 2024
_____  )

TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE DAVID C. NORTON
United States District Judge, presiding

A P P E A R A N C E S:

For Plaintiff:                  GEDNEY M. HOWE III, Esquire
                                ALVIN J. HAMMER, Esquire
                                Law offices of Gedney M. Howe III
                                P.O. Box 1034
                                Charleston, SC  29402

                                ROBERT R. GERGEL, Esquire
                                Pierce Sloan Wilson Kennedy Early
                                P.O. Box 222437
                                Charleston, SC  29413

For Defendants:                 BRIAN C. DUFFY, Esquire
                                CHARLES W. DANIEL, Esquire
                                Duffy and Young LLC
                                96 Broad Street
                                Charleston, SC  29401

Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
U.S. District Court Reporter
250 East North Street, Room 3401
Greenville, SC 29601

Proceeding recorded by electronic sound recording, transcript
produced by transcription service.

P R O C E E D I N G S

1

2      **MR. DUFFY:**  On behalf the defendants, may it please

3    the Court, I would like to split the argument today.  And I

4    plan on handling the 12(b)(2) arguments for Snap Inc.

5    Mr. Wilson Daniel would handle the arguments for the individual

6    defendants.

7           **THE COURT:**  Okay.

8      **MR. DUFFY:**  Your Honor, I want to start off by saying

9    it's terrible circumstances that bring everybody here today.

10   And it's heartbreaking.  And -- and -- and I have sympathy

11   for -- for the Batts family for what they've had to go through.

12         But I'm here today on behalf of Snap Inc.  And Snap

13   has created and developed a -- a mobile app, Snapchat, which is

14   a messenger app, which allows people to communicate through

15   video and -- and photos and ultimately can -- can embellish

16   those with stickers and filters and that sort of thing.  Some

17   of those draw from the information that the phone gathers, like

18   the temperature, or here, the speeds.  It's a speed filter that

19   you can apply to a photo.

20         The plaintiff here contends that -- that she --

21   not -- really not even she, that someone had used or might use

22   this speed filter, and that that contributed, or was a causal

23   factor in a third party's reckless driving that -- that led to

24   the loss at issue here.  That previous, or potential, use of

25   the app by someone on Johns Island is not a purposeful act by

1    Snap that is -- has any jurisdiction jurisdictional

2    significance here, Your Honor.

3         Recognizing that flaw, the plaintiffs pivoted --

4    although it seems that they have kind of pivoted back and --

5    and -- and ignored it.  But pivoted a bit and raised issues

6    about geotargeted advertising.  And certainly I -- I want to

7    talk through that that should not be regarded as a forum

8    contact either.  But in any event, there's no question that --

9    whether Snap generated revenue from ads that did not cause the

10   reckless driving on Johns Island that led to the loss for the

11   Batts family.

12        Your Honor, these -- I'll just add that -- that no

13   amount of jurisdictional discovery is going to change that.

14   And I will certainly address that later as well.  Your Honor

15   knows the steps, certainly, of the jurisdictional analysis.

16   Suffice it to say, we're here on a question of specific

17   jurisdiction and primarily two points to address.  One is

18   whether any acts by Snap Inc. purposely availed Snap of the

19   privilege of doing business in South Carolina.  The answer to

20   that should be no.

21        And the second question is, well, if there were some

22   contacts, were those, in light of the Ford Motor Company case,

23   sufficiently tied to the claims at issue here.  And the answer

24   there is also that they are not.  Again, even if you are to

25   consider it as advertising, this claim does not arise from

1    advertising and -- and should be -- that should not be part of

2    a jurisdictional finding here.  If it were, Your Honor, it

3    would be a groundbreaking decision.  It would go against all

4    line of cases in federal court that address social media apps

5    and -- and these types of products that are universally

6    available.  And certainly it would go against the federalism

7    concerns that are raised consistently through decades of

8    personal jurisdiction and jurisprudence.  So Your Honor, to

9    walk through that sort of higher-level discussion in more

10   detail, I'd like to talk through some of the cases that

11   establish these points.

12            So starting off with the fact that providing --

13   universally providing a website or an app is not purposeful

14   availment of any forum whether someone happens to access and

15   use that app.  Several cases make this clear on websites.  I'm

16   sure Your Honor is familiar with several Fourth Circuit

17   decisions.  There's the *ALS Scan* case.  There's the *Young v.*

18   *New Haven Advocate* case.  There's the *CareFirst of Maryland*

19   case.  And those are all early 2000s, addressing website

20   issues.

21            I'd like to talk a little bit about the analysis that

22   the *ALS Scan* opinion.  Because that was given in the context of

23   addressing newer technology as it was developed.  And the Court

24   said there, at 711: "Although the courts have recognized that

25   the standards used to determine the proper exercise of personal

1    jurisdiction may evolve as technological progress occurs, it

2    nonetheless has remained clear that technology cannot

3    eviscerate the constitutional limits on a state's power to

4    exercise jurisdiction over a defendant."

5         The court went on to say if it were to conclude

6    otherwise as a general principle that "the defense of personal

7    jurisdiction, in the sense that a state has geographically

8    limited judicial power, would no longer exist."

9         And then on Page 713:  "If that broad interpretation

10    of minimum contacts were adopted, state jurisdiction over

11    persons would be universal, and motions of limited -- notions

12    of limited sovereign -- state sovereignty and personal

13    jurisdiction would be eviscerated."

14         Your Honor, that -- that same principle has been

15    applied in cases about apps like Snapchat.  There's the

16    *Georgalis v. Facebook*, Northern District of Ohio case, that

17    rejected the idea that millions of users in Ohio created

18    purposeful availment.  That cited a Western District of

19    Washington case, the *Ralls v. Facebook* case, again saying:

20    "Personal jurisdiction over Facebook may not exist simply

21    because a user availed himself of Facebook services in a state

22    other than the states in which Facebook is incorporated and has

23    its principal place of business."

24         A case from the Eastern District of Virginia that was

25    similar that addressed the app WhatsApp -- that's a messaging

1    app similar to -- to Snapchat here -- had -- had the same

2    conclusion.  It's that basically you can't say WhatsApp is

3    subject to jurisdiction that all these forums -- they have

4    hundreds of millions of users.  That's just not how it works.

5    Just because a user downloads it and sends a message does not

6    create a purposeful contact by that act.  And -- anyway, the

7    court recognized that there's no authority to suggest

8    otherwise.

9         These same principles have been applied to cases for

10   Snap.  The *Ziencik v. Snap* case in the Western District of

11   Pennsylvania.  There's the *Hernandez* case from state court in

12   Arizona.  And the ruling there, again, is that Snap did not

13   expressly aim its conduct at Arizona because it was available

14   all over the country.  The nexus between Arizona's contacts --

15   Snap's contacts with Arizona and the asserted claims did not

16   exist.

17        Your Honor, aside from the basic point that providing

18   this universal app and people using it in different areas

19   doesn't create jurisdictional contact, I'd like to talk a bit

20   about the geotargeted advertising and whether that would

21   constitute a forum activity for the jurisdictional analysis.

22        **THE COURT:**  When are you going to get *UMG Recordings*?

23        **MR. DUFFY:**  I'm happy to get to that right now,

24   Your Honor.  So UMG was -- was considered, in fact, forum

25   activity for the purposes of that analysis.  But that was

1    because the activity, the -- the large number of forum

2    residents visiting that app were both creating the harm, the --

3    the -- the -- the raison d'etre of the defendant was this

4    piracy.  So visiting that -- those -- that number of forum

5    in-state users visiting the website was creating the harm, and

6    at the same time, funding it by paying.  Those ads were related

7    to -- that's what funded the whole website.

8          So it was called this -- a web that they couldn't

9    escape because the harm, the actual conduct that was created,

10   was because specifically those users were driven to the

11   website, and that's what funded the whole operation.  Which is

12   totally different from here.

13         Snap -- Snap is not in the business of creating car

14   accidents.  Getting people to Snap does not create car

15   accidents, or there'll be hundreds of millions of those.  This

16   is about a speed filter.  There's no advertisements about the

17   speed filter.  There's no data used from the speed filter in

18   advertisements.  And again, the location-based ads were not the

19   instrumentality of the -- as it was described as it was in UMG.

20         And, you know, I think it's worth noting that the

21   cases that UMG relied on were distinct as well.  One was a

22   Ninth Circuit case, *Mavericks*, which has since been

23   distinguished by the Ninth Circuit in the *AMA Multimedia* case,

24   which basically gives a better description of what this

25   geotargeting is.  It says:  Yeah, you might -- users will get

1   ads based on where they are, but the users are controlling

2   that.  The ad -- it's not the defendant saying: "I'm sending

3   this to you."  It's the third-party ads, third-party brokers.

4   And if a user -- you know, the same user could pull something

5   up in North Carolina or California and they're getting

6   different ads.  But it's because the user is drawing that.

7   It's -- it's -- and it's -- the court ends up saying to find

8   specific jurisdiction based on this would run afoul of the

9   Supreme Court directive in Walden and impermissibly allow a

10  plaintiff's contacts with the defendant and forum to drive the

11  jurisdictional analysis.

12          So, Your Honor, the -- the UMG case is the closest

13  thing that would tie a forum contact -- Snap to a forum action

14  in South Carolina.  And for those reasons that I've described,

15  I don't think it should.  But in any event, whatever

16  advertising Snap does that might be related to South Carolina

17  is not related to the claims here.  There's no claim based on

18  advertising.  There's nothing wrong with the advertising that

19  the advertising has done.  It's not Snap's ads either.  It's

20  third-parties' ads provided by third-party brokers that doesn't

21  relate to how Ms. Spooner drove on that fateful night.  So even

22  if there were a purposeful contact, it does not satisfy Ford

23  Motor Company's relationship test.

24          And there are other cases, similar cases, Your Honor,

25  where people accused Snap of being designed -- for example,

```
1   this North Carolina Palmer v. Savoy case -- designed to allow

2   these graphic sexual images to be -- to -- and -- and profit

3   from that to be circulated.  And the court decided that

4   plaintiffs offered no evidence that Snap has gathered North

5   Carolina-specific user data and sold advertising data to others

6   seeking to target the North Carolina consumers.

7          However, the fact remains that plaintiffs' injury

8   does not directly relate to Snap's conduct in that regard.

9   While plaintiffs' injury arises from the use of the Snapchat

10  platform made available via the Internet, the injury does not

11  arise from Snap's sale of advertising or user data.

12  The -- a case before the Ford Company case was same Georgalis

13  v. Facebook case I mentioned before that decided the same

14  thing.

15         And then the third circuit decided the same thing in

16  a case after Ford Company -- Ford Motor Company case in 2021.

17  It's called Hepp v. Facebook.  And it was really analyzing the

18  Reddit and Imgur jurisdiction in Pennsylvania.  And again,

19  the -- the plaintiff said that those two entities targeted

20  their advertising business to Pennsylvania, and even had other

21  things.  They had a merchandise store that sells products to

22  Pennsylvanians.  They had premium memberships and -- and

23  communities organized around Philadelphia.  But like here, none

24  of these contacts formed a strong connection to the

25  misappropriation of the image, which was the nature of the
```

1    claim there.  And so *Hepp* failed to establish a strong

2    connection present in *Ford Motor Company*.

3          Your Honor, the same is -- you know, well, we've --

4    we've talked about the advertising.  But the *Johnson v.*

5    *Huffington Post* again says, you know, advertising to people

6    when they come on doesn't have anything to do with the claims

7    at issue there.  I will note also for -- I think that the court

8    in the UMG case was a little suspect that it was going out on

9    the limb about advertising and made sure to point out that

10   there were other jurisdictional factors they were relying on,

11   including just contact generally with the US, and that the

12   domain hosting administrating companies were located in

13   Virginia.  They're hosted by Amazon in Virginia.  They filed

14   a -- registered a copyright act agent with the US Copyright

15   Office; had a US-based advertising broker.  Again, this is

16   under Rule 4(k)(2), because there was no other states, started

17   looking nationally as well.  Registered websites with US-based

18   domain registers and had US-based service.

19         So, Your Honor, I think that case is certainly not

20   what's at issue here.  Happy to discuss any of that further.  I

21   mean, it's -- again, the -- the -- all of these cases that --

22   that even debate this are cases where the website itself,

23   what's happening is the wrong.  That's not true with Snap, and

24   it's not alleged to be true.  It's not alleged that Snap --

25   accessing Snap caused this.  Again, it'd be hundreds of

1    millions of accidents if that's what it was.  This is

2    particularly about a speed filter, that -- there are no

3    advertisements about, no revenue generated from, as the

4    affidavits that have been submitted demonstrate.

5         Your Honor, I'd like to get back to the federalism

6    point, which is something that the Supreme Court has emphasized

7    recently as well in the *Bistol-Myers Squibb* case in 2017.

8    And they -- and first, you know, it's -- it's kind of funny.

9    They're all these different ways that the courts articulate how

10   something has to relate.  But what the Supreme Court said here

11   is I thought helpful as a way to think through it.  "Specific

12   jurisdiction is combined to adjudication of issues deriving

13   from or connected with the very controversy that establishes

14   jurisdiction."

15        And Your Honor, I mentioned earlier that -- that the

16   plaintiff seems to be backing away from the advertising point.

17   And I want -- I just want to cite how they described the case.

18   This is Docket Entry No. 30.  And its relates to the

19   jurisdictional discovery.  It's their reply where they list

20   some points.  And they say -- hey, defendants contend the

21   plaintiffs haven't explained why defendants' contacts are

22   related or sufficiently related or prominently of cause.

23        And their response is:  "Defendants' action in

24   creating and providing speed filter to South Carolina

25   residents."  That's it.  That what they're focused on.  That's

1    not a jurisdictionally-relevant issue. That's a -- that's a

2    universally-available app. And the cases all hold that that

3    does not create any forum-targeted contact.

4          Again, as alleged in the complaint, providing the

5    speed filter was negligent in causing this. Then they go on.

6    This exact activity occurred and resulted in the death. As a

7    result of defendants providing the speed filter to South

8    Carolina users. There's nothing about advertising. It's -- it

9    is not connected to the driving and poor driving choices that

10    were made that night. And again, the ad -- the declarations --

11    or affidavits demonstrate that a speech filter has nothing to

12    do with the advertising anyway.

13          But back to the *Bistol-Myers Squibb* point, Your

14    Honor. The court reiterates that: "Restrictions on personal

15    jurisdiction are more than a guarantee of immunity from

16    inconvenient or distant litigation. They are a consequence of

17    territorial limitations on the power of the respected states.

18    Sovereignty of each state implies a limitation on the

19    sovereignty of all the sister states."

20          And -- and I think, well, you know, what is relevant

21    here, the court declares that even if: "The defendant would

22    suffer minimal or no inconvenience from being forced to

23    litigate before the tribunals of another state; even if the

24    forum state has a strong interest in applying its law to the

25    controversy; even if the forum state is a most convenient

1   location for litigation, the Due Process Clause acting as an

2   instrument of interstate federalism may sometimes act to divest

3   the state of its power to render a -- a valid judgment."

4         And there, the court said you could not have that --

5   the case that *Bistol-Myers Squibb* had, you know, technology

6   offices, research and development sold, all kinds of things,

7   hundreds of 1000s -- or 1000s maybe of employees in California.

8   And there was no jurisdiction over the case at issue, because

9   it was -- the claims were not connected to what Bistol-Myers

10   did in California.

11         And, Your Honor, I suggest a finding that there is

12   jurisdiction here would be a finding that would relax these

13   requirements into what the Supreme Court cautioned against as a

14   loose and spurious form of general jurisdiction.  I

15   respectfully request that the Court avoid making that type of

16   groundbreaking decision, and grant the motion to dismiss.

17         **THE COURT:**  Who's -- you know, who's -- have y'all --

18   y'all divided this up too?

19         **MR. GERGEL:**  We've not divided it up in the same way,

20   Your Honor.  We -- but we have divided it up somewhat.

21         **THE COURT:**  Okay.

22         Who's -- who's got the first -- who's got the

23   response to it?

24         **MR. GERGEL:**  I can -- I can address.

25         **THE COURT:**  Okay.

1          We'll take you.  And then we'll take Mr. Daniel.

2  Then we'll take whoever want to respond to that.

3          **MR. DUFFY:**  Thank you.

4          **MR. GERGEL:**  May it please the Court.  I'm Richard

5  Gergel here on behalf of the plaintiffs.  And I'm gonna take

6  some of the arguments.  And Gedney Howe will take -- will clean

7  up after me and make some points after I've finished up.

8          So listening to Snap's arguments today, and with

9  the -- the benefit of the briefing, the extensive briefing in

10  this case, it seems like there's sort of two main issues before

11  the Court.  First, in regard to purposeful availment, does

12  Snap's provision of Snapchat in South Carolina; the speed

13  filter in South Carolina; does their collection of data from

14  South Carolina users, 800,000 plus South Carolina users; their

15  harvesting of that data; and their direction of targeted

16  advertising to over 100,000 South Carolina users, together does

17  that demonstrate at least a facial case of purposeful

18  availment?

19          Second, in regard to relatedness.  Plaintiffs claim

20  is essentially that Snap induced dangerous driving and caused a

21  car crash that killed their daughter.  They also claimed that

22  Snap offered a feature as part of Snapchat called speed filter

23  that induced and encouraged, incentivize dangerous driving,

24  particularly among teenagers, Snaps target demographic.  So the

25  question is:  Does -- does Snap's offering of this speed filter

1  in South Carolina and used this filter to collect data on South

2  Carolinians for advertising purposes relate to plaintiffs'

3  claim?  And under *UMG Recordings*, the answer to both is yes.

4          Snap, in its affidavits and some of the briefing,

5  they describe themselves as a camera company; a technology

6  company; in some places, a communication company.  In reality,

7  Snap is an advertising company.  They make more than 99 percent

8  of their revenue from selling ads on the internet.  What does

9  that mean?

10          They're not selling ads like the ads you see on the

11  CBS Evening News, where everybody sees the same ad for the same

12  product at the same time.  These are hyper-targeted ads.  They

13  rely on an extensive amount of data and metrics collected from

14  each user that Snap pulls from the user and then sends back to

15  that user based on their specific location, along with other

16  data.  That is the business model that funds Snap, sort of --

17          **THE COURT:**  They don't send it back.  Third-party

18  people send it back, right?

19          **MR. GERGEL:**  That's a matter for discovery.

20  But regardless of whether it's Snap or -- or third parties,

21  under UMG says that that's a sufficient connection.

22          To run the business that Snap is running, you need

23  two things:  You need an audience and you need data.  And Snap

24  provided the Snapchat app and the speed filter in

25  South Carolina to further both of those ends:  To cultivate a

 1    market, an audience in South Carolina, meaning eyeballs for

 2    those ads, and sources of data so that Snap could more

 3    efficiently target and sell the ads that their business relies

 4    on.  So what -- what is Snap?

 5            I mean, as I said, they're an advertising company.

 6    But the Snapchat app, the platform that they operate, basically

 7    allows users, including teenage users like Ms. Batts, to shoot

 8    videos, photos, and edit, or in Snap's terminology, augment

 9    these -- these images with filters and -- including the speed

10    filter feature here, which basically allowed someone to capture

11    their live speed, and put it on a video and share it with their

12    friends on Snapchat.

13            Now, to avail yourself to all these features, the

14    "Speed Filter" feature or Snap in general, each user has to

15    agree to Snap's Terms of Service, including every user in

16    South Carolina.  These terms of service allowed Snap to track

17    the user's activities, every interaction they had on Snapchat,

18    to track their real-life location in the physical world, and to

19    mine that data for use in targeting apps.  All of those are

20    activities that's not conducted in South Carolina.

21            They are -- they're monitoring the people in South

22    Carolina.  They're following their geographic location.

23    They're following their activities in South Carolina.  And

24    they're sending those ads, based on that harvested data, back

25    to South Carolina.

1          So Snap provided the filter, the speed filter and the

2    whole app in South Carolina to incentivize use, to further data

3    collection to further its advertising program.  And we also

4    think that specifically in regard to the speed filter, one of

5    the incentives of offering it, was that it would require users

6    to share with Snap their -- their geographic location.  This is

7    obviously a matter for further discovery.  But we think that

8    the terms of service or opening an account of Snap didn't

9    automatically require the user to share their location.  So

10   Snap had to incentivize that.  And one of the ways they did

11   that was offering these features that would require the user to

12   share their physical geographic location, which Snap wanted for

13   advertising purposes.

14          And all this -- all of this worked.  All these

15   efforts to cultivate a market in South Carolina worked.

16   According to Snap's own numbers provided in the affidavit,

17   they've got 800,000 daily users in South Carolina.  Those are

18   numbers that speak to use that is way beyond anything that the

19   local newspaper in New Haven case had or the pregnancy center

20   in CareFirst.  This is a -- CareFirst case had.  This is just a

21   different order of magnitude in terms of daily use.  And Snap

22   attracted these users and kept these users by luring them to

23   the app with features light speed filter that plaintiff alleges

24   caused this collision.

25          UMG controls both of the issues before the Court

1   today.  UMG was -- the question there was whether a Russian

2   website operator, an individual defendant I might add, was

3   subject to personal jurisdiction in Virginia based on his

4   operation of a website that when a Virginia -- when Virginia

5   users would log onto the website, showed the Virginia users'

6   ads targeted to them based in part on their location.  And the

7   Court said that was sufficient for jurisdiction.

8           In -- in regards to purposeful availment, the court

9   looked to the number of visitors.  And the number of visitors

10  in that case was like one -- one and a half million over a

11  12-month period.  Well, there's 800,000 individual users a day,

12  according to Snap's numbers.  Again, a different order of

13  magnitude.

14          They also said that these visits were of a commercial

15  nature.  Even though like in our case, the users aren't paying

16  for the service, Snap, like UMG, is luring them to the site

17  with this free software.  In the UMG case, it was this

18  copyright infringement software.  And Snap -- once they were

19  lured there, the UMG defendant collected their data and used

20  that collected data to target the Virginia visitors.  The court

21  said that was sufficient for purposeful availment.

22          Now, in regard to the relatedness requirement, the

23  question of whether that suit related to the Russian website

24  operators' Virginia contacts, the site -- the court said that

25  the site plus those ads that bankrolled the site

1    sufficiently -- was sufficiently related to the claims.  They

2    said that it's more than just a website being available,

3    although that's relevant that it was available.  It's certainly

4    not irrelevant.  But that's not enough.  In addition to the

5    availability, the operator knew about the Virginia audience,

6    because he was exploiting the Virginia audience, collecting

7    their data.  And that -- and that data bank rolled.  It funded

8    the operation.  So it's not just about this availability, it's

9    the availability plus other evidence of -- of an intent to

10   target the forum.  And that evidence in both cases is the -- is

11   the use of data from that forum to send targeted ads.

12        **THE COURT:**  So you agree that availability alone

13   would not -- it would not create jurisdiction?

14        **MR. GERGEL:**  Yes.  And neither -- we're not asserting

15   that availability alone confers jurisdiction.

16        **THE COURT:**  I just take one -- one step at a time.

17   Go ahead.

18        **MR. GERGEL:**  And obviously, if for some reason the --

19   the Court is -- wants to look beyond *UMG Recordings* and look at

20   *ALS Scan*, which is the leading case on a jurisdiction arising

21   from internet context in the Fourth Circuit, UMG -- excuse me,

22   *ALS Scan* established this sliding scale or spectrum.  And on

23   one end, you have passive websites that are not very

24   interactive.  On the other end, you have highly interactive

25   websites.

1          And the way that *ALS Scan* described those website is

2     the example was a company that does business over the internet

3     that involves the knowing and repeated transmission of

4     information online.  Well, that's exactly what Snap is.  That

5     is exactly how Snap collects the data.  They're -- they're

6     looking at interactions online and monitoring those

7     interactions.  Knowing and repeated transmitting of this

8     information is how Snap operates.  So under just the most plain

9     reading of *ALS Scan*, jurisdiction is proper here.

10          However, if you wanted to categorize, Snapchat is a

11     somewhat interactive application.  You -- you'd look to other

12     Snap as directing activity to South Carolina, whether the

13     plaintiffs' claims arose from those activities directly to

14     South Carolina, and whether there was evidence that those South

15     Carolina-directed activities, or whether those activities are

16     coupled by like an evidence of intent to engage in a business

17     or other interactions in South Carolina.

18          Okay.  Well, here we've clearly got activities

19     directed at South Carolina.  They're running an app where

20     800,000 people in South Carolina are using it a day.  Not only

21     the Snapchat app but the speed filter are both directed to

22     South Carolina.  The question is whether there's evidence of

23     intent to engage in business or other interactions.  And that's

24     where the advertising comes in and the data collection comes

25     in.  Those evidence the intent to engage in business in

1    South Carolina.  And plaintiffs' claims arise from these

2    activities.  Because the very feature at issue here is -- is

3    the Snapchat Speed Filter is used to encourage use of the apps.

4    Snap can collect data; can collect location data.  These things

5    are intimately woven together.  It's the exact kind of web that

6    the UMG court said was sufficient to confer jurisdiction.

7              So with that, I -- those are our arguments in regards

8    to --

9              **THE COURT:**  Okay.

10             **MR. GERGEL:**  -- jurisdiction over Snap.

11             **THE COURT:**  Thank you.

12             Yes, sir.

13             **MR. DUFFY:**  Thank you, Your Honor.  Just briefly.

14   You know, can certainly debate the UMG points that were -- ALS

15   isn't a commercial, the whole sliding scale was about if it's

16   interactive, that means it's more commercial.  UMG even said

17   that doesn't really apply.  Interactive -- interactivity

18   doesn't mean commercial.

19             Commercial would have been downloading the things

20   from the UMG website.  The whole -- again, the whole raison

21   d'etre of that thing was piracy.  Getting people there meant

22   actual conduct.  That is different from what's happening here.

23   Going to Snap was not actionable conduct.

24             And -- and I do want to correct one -- draw the

25   Court's attention to the Mourkogiannis affidavit.  Because that

1    directly refutes the representations that are being relied on

2    here that the filter and data is being used for advertising.

3    It's not.  The filter doesn't relate to advertising.  It's

4    clear through -- through paragraphs 11 and 12 of that

5    affidavit.

6            But beyond that, Your Honor, all we've heard just now

7    was a recitation of how social media apps work.  This is what

8    everyone does all over the country.  There was no description

9    of Snap does in South Carolina that's any different from

10   everywhere else.  And they're not subject to jurisdiction

11   everywhere.  The cases make that clear.

12           **THE COURT:**  Thank you.

13           Mr. Daniel.

14           **MR. DANIEL:**  Thank you, Your Honor.  Thank you,

15   Your Honor.  May it please the Court.  Wilson Daniel here on

16   behalf of Snap.  As Mr. Duffy indicated, I'm going to handle

17   the motion to dismiss with respect to the individual

18   defendants.

19           In addition to Snap Inc., Your Honor, plaintiff named

20   as defendants Evan Spiegel and Emily White.  Evan Spiegel is

21   the current CEO of Snap Inc. and Ms. Spiegel -- or Ms. White is

22   the former CEO of Snap.

23           Mr. Spiegel and Ms. White are not subject to personal

24   jurisdiction in South Carolina, because they have not

25   purposefully availed themselves to the privilege of conducting

1    business in South Carolina by intentionally directing

2    activities to South Carolina.

3         The complaint is devoid of any allegations that

4    Mr. Spiegel or Ms. White directed activity specifically and

5    purposefully to South Carolina -- to South Carolina.  And the

6    only other evidence in the record indicates that they did not

7    do so.  I know the Court is very familiar with the law of -- of

8    specific jurisdiction.  And the -- and the test the Court

9    should apply here is the same test that Mr. Gergel and

10   Mr. Duffy have gone over today.  It's just a different

11   application.

12        The plaintiff still needs to make two showings with

13   respect to these individual defendants.  First, they need to

14   demonstrate that these individual defendants purposefully

15   availed themselves to the privilege of conducting business in

16   South Carolina by purposefully directing activities into the

17   forum.  And second, the plaintiff must also demonstrate a

18   substantial connection between the defendants' -- the

19   individual defendants' forum state contacts and the plaintiffs'

20   claims.  Applying that law, Your Honor, in the context of

21   individual corporate officers, the Fourth Circuit has

22   explicitly held that a corporate officer's status as an officer

23   or an employee of a corporation is not enough to confer

24   personal jurisdiction.  And I'll quote the Fourth Circuit here:

25   "If the claim against the corporate agent rests on nothing more

1   than that he is an officer of the non-resident corporation and

2   if any connection he had with the commission of the tort accord

3   with -- occurred without the forum state, under sound due

4   process principles, the nexus between the corporate agent and

5   the forum state is too tenuous to support jurisdiction over the

6   officer personally."  That's the Columbia Briar rate -- gate

7   case, Your Honor, that's cited in our briefs and has been

8   relied upon in the Fourth Circuit and in this district for

9   decades.

10          This court, Your Honor, has distilled that law into

11   the following tests.  An individual officer is subject to

12   personal jurisdiction only where the officer, him or herself,

13   engaged in sufficient directed activity in South Carolina in

14   relation to the plaintiffs' allegations.  And that's a quote

15   from a decision I'll talk about in a little bit, Your Honor,

16   *Gault versus Thatcher*, which is a 2018 opinion from this court

17   from Your Honor.

18          But the point here, Your Honor, is that the critical

19   element in this analysis is whether the individual defendant

20   purposefully directed activities towards the forum state or

21   conducted business inside of the forum state.  And that's

22   totally absent here from the plaintiffs' complaint.  So let's

23   look to the relevant allegations in the plaintiffs' complaint,

24   Your Honor.

25          The plaintiffs -- the only allegations that

1    specifically mentioned Mr. Spiegel and Ms. White allege as

2    follows.  First, that they are not citizens of South Carolina.

3    So we know that doesn't get us to personal jurisdiction.

4    Second, that Mr. Spiegel and Ms. White were acting within the

5    scope of their employment at Snap at all times.  We know under

6    Fourth Circuit law under the *Briargate* case that that doesn't

7    get you to personal jurisdiction.  And third, Your Honor, the

8    complaint alleges that, and -- and I'm paraphrasing here, that

9    Mr. Spiegel and Ms. White directed and exercised control over

10   certain unspecified corporate activities related to

11   location-based advertising and to the speed filter.  And that's

12   not enough either, Your Honor.

13         Because critically, what is missing here are

14   allegations that the defendants somehow purposely availed

15   themselves to the privilege of conducting business in

16   South Carolina by either visiting South Carolina and conducting

17   business there or purposefully directing activities to the

18   forum state.  And when you look to the -- the only other

19   relevant evidence in the record, Your Honor, are the affidavits

20   from Mr. Spiegel and Ms. White.  And in those affidavits, the

21   individual defendants testified that they are not citizens of

22   South Carolina; they do not own property in South Carolina;

23   they don't pay taxes in South Carolina.  And critically, Your

24   Honor, they both testified that in their employment with Snap,

25   they've never purposefully directed activities to the state of

1   South Carolina.

2          So what we're left with, Your Honor, in the complaint

3   are general allegations that two California residents, working

4   for a California company made certain corporate decisions from

5   the corporate headquarters in California, and that those

6   decisions under the plaintiffs' theory, had an impact on a

7   plaintiff in South Carolina.  And that is not enough to create

8   personal jurisdiction.  That does not rise to the level of

9   purposeful availment.

10         And I want to direct the Court's attention to just

11  one case.  It is not in the defendants' brief.  I've shared

12  this case with plaintiffs' counsel.  And I will, if -- if Your

13  Honor will have me approach --

14         **THE COURT:**  Sure.

15         **MR. DANIEL:**  -- I'll share the case with you-all as

16  well.

17         Thank you, Your Honor.  This is a 2018 opinion from

18  Your Honor in a case called *Gault versus Thatcher*.  And I

19  highlighted for you because I think the circumstances -- the

20  circumstances there are directly analogous to the circumstances

21  here.  And -- and -- and what's sort of critical in that case

22  is that the court applied the same test, which -- which is

23  this, and -- and I'll quote the court now.  "The individual

24  officer's role as an officer of the corporation does not

25  justify the court's jurisdiction over her.  Instead, the court

1  may -- may exercise jurisdiction over her if it finds that she

2  otherwise engaged in sufficient directed activity in South

3  Carolina in relation to the plaintiffs' allegations."

4        And so the court found there that there was no

5  jurisdiction over the individual officers.  And that's because

6  there were no allegations that the individual officers directed

7  any corporate activities specifically into South Carolina.

8  Instead, what you had in that case was a corporate officer in

9  Georgia making corporate decisions in Georgia that had an

10  impact on a plaintiff in South Carolina.  And what Your Honor

11  held is that that is not enough.  That is not purposeful

12  availment.  That does not rise to the level of purposefully

13  availing oneself to the privilege of conducting business in

14  South Carolina.  And so there was no personal jurisdiction

15  there.

16        Your Honor, the plaintiff generally does not dispute

17  any of the law that I've gone through today.  Instead, the

18  plaintiff relies whole cloth on a -- on a theory called -- or

19  on a doctrine called the -- the "guiding spirit" doctrine.  And

20  I want to spend just a -- a minute talking about that doctrine.

21        What -- what that doctrine says, Your Honor, is that

22  when a -- a individual officer of a company directs torturous

23  activity into a forum state and thereby subjects himself to

24  personal jurisdiction in that state, that corporate officer

25  cannot then hide behind the shield of -- of the corporate forum

1   and say, you know:  That was the company's actions.  Those

2   weren't my actions.  I'm not subject to jurisdiction there.

3          The guidance spirit theory says -- or doctrine says:

4   No.  No.  When an individual officer directs tortious activity

5   into a forum and he is the guiding spirit behind that corporate

6   activity that was specifically and purposefully directed into

7   the forum, he is subject to personal jurisdiction in that

8   forum.

9          What the guiding spirit doctrine does not do is

10  obviate the plaintiffs' requirements to show purposeful

11  availment.  Regardless of the -- before we get to the guiding

12  spirit theory, the plaintiff has to demonstrate that the -- the

13  individual defendants purposely availed itself to the forum

14  state, either by conducting business in the forum state or by

15  directing activities specifically to the forum state.

16         And hopefully, Your Honor, the law on this doctrine

17  is -- is fairly well developed.  And specifically in the

18  district of South Carolina, there are five or six cases that

19  analyze and apply the guiding spirit doctrine.  And all of the

20  cases, Your Honor, asked the same question that you asked in

21  *Gault versus Thatcher*, which is:  Did these individual

22  defendants purposefully and directly direct activities into

23  South Carolina and conduct business into South Carolina?  Did

24  they do something that purposefully availed them to South

25  Carolina independent of sort of just -- just corporate decision

1   making that had an impact on the plaintiff in the forum?

2   And -- and where the answer to that question is no, there is no

3   purposeful availment; there is no personal jurisdiction.  And

4   that's the case here, Your Honor.

5           And the most compelling sort of point on the guiding

6   spirit doctrine, Your Honor, is that -- is that you considered

7   and rejected a guiding spirit argument in the case that I just

8   handed up, the *Gault versus Thatcher* case.  And what you said

9   in that case, Your Honor, is this:  The guiding spirit doctrine

10  applies where the individual officer, quote, engaged in

11  activities that were clearly directed towards the forum state

12  and only if he had availed himself to the benefits of operating

13  under the forum state's law.  We don't have any allegations to

14  that effect here, Your Honor.  There's no allegation that Mr.

15  Spiegel or that Ms. White were focused on South Carolina and

16  somehow directed activities regarding Speed Filter, or

17  activities regarding location-based advertising towards

18  South Carolina.  There's no allegations like that.

19          And just a very quick policy point, Your Honor.  As a

20  practical matter, if generalized allegations of corporate

21  decision making could subject individual officers to personal

22  jurisdiction, then in -- in every case, against the national

23  corporation, the plaintiff would add individual officers as

24  defendants.  And those defendants would be subject to personal

25  jurisdiction in any state, you know, where their product was

1    available; where their product ends up.  And that would

2    completely and totally undermine the purposeful availment

3    requirement, which is the constitutional touchstone of the

4    personal jurisdiction inquiry.  And with that, Your Honor, I'm

5    happy to answer any questions you have.

6            **THE COURT:**  Thank you.

7            **MR. DANIEL:**  Thank you.

8            **MR. HOWE:**  Good morning Your Honor.  My name is

9    Gedney Howe.  I'm here on behalf of the plaintiffs.  I'd like

10   to apologize.  You know, we broke our case up a little

11   differently.  So I'm gonna be a little bit more broad if that's

12   all right.

13           **THE COURT:**  That's okay.

14           **MR. HOWE:**  I'd like to begin by -- I'd like to begin

15   with Snapchat itself, Snapchat the business, and what they are

16   doing to avail themselves of business in South Carolina.  And

17   I'd like to direct Your Honor to, first, Snapchat in 2016 went

18   ahead and they have registered and reserved their name with the

19   South Carolina Secretary of State to protect their rights as a

20   business here in South Carolina.

21           Furthermore, as Snapchat said in their brief, they

22   have 300 -- I'm sorry.  They have hundreds of millions of daily

23   users.  And Snapchat artfully articulated that only .26 percent

24   of those users are in South Carolina.  That translates to

25   800,000 users here.  That's almost one in five people in this

state.  Furthermore, that 800,000 people is primarily children,
Snapchat's primary demographic.  They claim that they have 90
percent of 13- to 24-year-olds in the United States as their
users.  These users are opening the app as, on average, 30
times a day.  These users are sending as a whole now -- this
is -- these numbers are from 2021, Your Honor -- are sending 5
billion snaps every day.  Again, using that same .26 percent,
that is 13 million snaps being sent by South Carolina users
every day.

Every time they open that app, they are sending data
and receiving advertisements not from third parties but from
Snap.  Advertisements do not -- it's not like tuning into CVS
and it's just there.  Every time you open your phone, the ad is
different.  And the ads exist only within the Snapchat
application.

Snapchat targets these young people because they are,
quote, still developing brand loyalty, which is attractive for
advertisers who focus on lifetime value.  And I'll read you,
this is from one of our exhibits, the 10-K.  The reason --
excuse me -- the reason for the speed filter, the reason for
the features and functionality of Snapchat -- they are not
distinct parts.  If we imagine a Swiss army knife, that is
Snapchat.  The toothpick is the speed filter.  But it does all
sorts of things.  And the reason that Snapchat creates these
features is to continue to compete with other companies to

attract and retain their users' attention to make sure that
their users engage more with their product than competing
products.  And they say that if they fail to introduce new and
exciting products or services, they'll lose those users.  So
Snapchat has purposely taking steps, creating features to
engage children in that demographic, including those in South
Carolina.

       **THE COURT:**  Mr. Howe, when you were 24 years old,
were you a child?

       **MR. HOWE:**  Sitting here as -- being 30 years old now
thinking back, it sure feels that way.

       **THE COURT:**  I can see a 13-year-old as being a child.
But everybody 16 and above doesn't sound like children to me.
Young adults, how about that?

       **MR. HOWE:**  We can stick with young adults.

       Judge, part of these case is -- as we begin to talk
about Evan Spiegel and Emily White, is their role.  But we have
to look back to Snapchat's near inception.  And it was in 2013
that these smart filters were announced.  And they said, you
know, we'll be able to do time; temperature; even how fast
you're moving.  Evan Spiegel announced that himself.  Because
at that time in 2013, when he was directing the creation and
deployment of these features to increase their user base in
places like South Carolina, there were only 20 employees
working for Snapchat at that time.

```
 1          Now, Mr. Daniels, my former classmate, made some
 2    excellent arguments.  But again, I want to focus you in to, A,
 3    the allegations that we've made against Snapchat, we've also
 4    made against the individual defendants.  Furthermore, in the
 5    Magic Toyota case, Judge, the Court talked about direct
 6    personal involvement typically exists where the defendant is
 7    the guiding spirit behind the wrongful conduct or the central
 8    figure in the challenged corporate activity.
 9          And then, the Escude Cruz, it requires some showing
10    of direct personal involvement by the corporate officers in
11    some decision or action which is causally related to the
12    plaintiffs' injury.
13          Again, in a company of 20 people where Evan Spiegel
14    is the founder and the CEO, this is deployed.  That is the
15    atmosphere in which this began.  And that culture of Evan
16    Spiegel being a hands-on boss has never lapsed.  Years after
17    the deployment of the speed filter initially, Evan Spiegel in
18    the interview says that he's in the design studio two to three
19    days a week, being directly involved in the creation and
20    functionality and user interfaces of Snapchat.
21          Everyone at Snapchat answers to Evan Spiegel,
22    including Emily White.  When she was let go, her position was
23    absorbed by Mr. Spiegel.  But her significance of this is that
24    she was the chief operations officer.  She was the one on watch
25    at the end of -- she became on the beginning of 2014, which is
```

1    when the full deployment of the speed filter went into effect.

2        **THE COURT:**  It was deployed everywhere in the world,

3    right?

4        **MR. HOWE:**  It was deployed everywhere in the world,

5    yes, Your Honor.

6        **THE COURT:**  So it wasn't deployed just in South

7    Carolina.

8        **MR. HOWE:**  Now, in the affidavits from Evan Spiegel

9    and from Emily White -- yeah -- Emily White, we received those,

10   those I certainly expected them to say:  "We had nothing to do

11   with this app.  You know, I got rich, cashed out, and I'm in

12   the French Riviera.  I have no connection."  He does nothing to

13   downplay his direct involvement with the app and the

14   development of the app.

15       What they say is that neither Snapchat, nor the

16   speed -- speedometer filter, or speedometer sticker, were in

17   any way directed at the state of South Carolina.  Now, Judge,

18   to say that Snapchat has never in any way been directed at the

19   state of South Carolina flies in the face of fact.  Just

20   yesterday, I sent my law clerk to this courthouse where he took

21   a picture in front of the courthouse on Snapchat.  And Snapchat

22   provides a filter for US District Court of 85 Broad Street.

23   That's not in Tallahassee.  That's here.  That is Snapchat

24   creating content directed at this state as they always have

25   done.

1          Judge, the standard here.  And the reason I bring up

2     these points is, we want to show you that we believe

3     jurisdiction here is appropriate, that our allegations that we

4     have made properly in the complaint against Snapchat and the

5     individual defendants are more than speculation and conclusory

6     assertion.  They are solid accusations with a foundation in

7     fact that, as the case progresses, we think will only get

8     firmer.

9          If Your Honor has any questions, if you are concerned

10    about the fact-intensive nature of the analysis here, let us --

11    grant us the right to do some jurisdictional discovery so we

12    can go develop a record on which to determine the role of each

13    defendant in the relevant events.

14         We expect the jurisdictional discovery to show the

15    role and activity of the individual defendants in Snap

16    providing the speed filter on the Snap app, including that

17    individual defendants' work, focused on all -- on users in all

18    50 states including South Carolina.  We expect to show

19    defendants' target or solicited users from all 50 states

20    including South Carolina, that they derived income from South

21    Carolina advertisers, and that they -- that income was based on

22    data retrieved from South Carolina users.

23         **THE COURT:**  So under your theory, Snapchat can be

24    sued in every state.

25         **MR. HOWE:**  I'm about --

1          **THE COURT:**  Yep?

2          **MR. HOWE:**  Yes, Your Honor.  And I'm gonna jump now

3   to tell you why.

4          Snapchat in their own 10-K's they filed with the

5   Securities and Exchange Commission say that their business is

6   that they and their customers, right -- their customers are

7   distinct from the users.  Their business is targeted

8   advertising to teens based on the profiling of personal

9   information.

10          This case, why we're here, is about a car wreck where

11   Kaiea Batts died.  She died -- she was a little girl from

12   Johns Island.  She was in the car with Carly Spooner and Lauren

13   Denton, who are other -- two other little girls from Johns

14   Island.  If you leave this courthouse and drive down Maybank

15   Highway and take a ride at the Habitat for Humanity home store,

16   you will get to Kaiea Batts' little yellow house.  And Snapchat

17   knew all of that.

18          They have announced an outrageous amount of data that

19   they were collecting on -- on Kaiea Batts.  They know that she

20   is -- they know the date that her account was created.  And

21   they say that the information we used -- we collected is used

22   to personalize content and ads.  They know when she opens her

23   phone, even if she doesn't give them the right to track her --

24   track her location, they'll still try to guess it based on her

25   IP addresses.

1          They know that she frequently visits Johns Island and

2    Charleston.  They know that -- they're collecting -- they

3    collect more than just location data, Judge.  They know that

4    she's interested in internet culture, cosmetics and makeup, ice

5    cream and frozen yogurt, high school life.  They know the

6    websites that she interacts with.  They -- so I -- presumably

7    through the app.  The explanation is not terrific.  They know

8    that she's going to Charlestonterrors.com and Kia Country of

9    Charleston.  They know every ad that she interacts with through

10   their service; everything that occurs.  They know all of her

11   interests.

12          And Judge, the night of the accident, they are

13   tracking her phone.  And they're tracking so closely that over

14   the course of about three hours, it generates 20 pages of GPS

15   coordinates.  And all of that occurs through the Snapchat app

16   on Kaiea Batts -- this is her phone.  This is what Snapchat was

17   tracking, what they used to collect everything she ever did

18   when she was on Johns Island.

19          And all of their data, all their tracking, the money

20   that they were making selling her data culminates here.  The

21   GPS data right here is the moment that she died.  That's when

22   her car -- the car she was in quit moving.  And that's what she

23   is to Snapchat.

24          That's why there's such a divide between our two

25   tables is, they don't see the humanity.  They see South

1    Carolina as .26 percent of their business.  We see it as

2    800,000 people here.  They see Kaiea Batts as a list of

3    coordinates and a list of interest.  We see her as a little

4    girl who did Spanish classes and died in a car that got split

5    in half.  That is the fundamental reason that we can't agree

6    about what this case -- whether this case should be here.

7    Because South Carolina is not important to Snapchat.  But it is

8    important to us and it was important to Kaiea Batts.

9    Your Honor, I'd be happy to answer any questions you might

10   have.

11            **THE COURT:**  Okay.  Thank you.

12            **MR. HOWE:**  Thank you.

13            **MR. HAMMER:**  Your Honor, could I add one thing to

14   what Mr. Howe just put in the record?

15            **THE COURT:**  Sure.

16            **MR. HAMMER:**  Thank you, Your Honor.

17            **THE COURT:**  For the record, it's Alvin Hammer.

18            **MR. HAMMER:**  My name is Alvin Hammer.  And what I

19   would add is, if -- if you -- I think that Mr. Daniel did

20   mis- -- misquoted our complaint.  The complaint is that the

21   individuals, Emily White and Evan Spiegel determined, directed,

22   controlled, participated in the conduct and activity of Snap

23   complained of herein.

24            And then we look at what was complained of herein.

25   It says:  Defendants created, maintained, provided the

1    dangerous speed filter to users in South Carolina, including

2    the driver of the subject vehicle, for the purpose of

3    encouraging increasing Snapchat's use in South Carolina from

4    whom the defendants collected commercial -- collect --

5    collected data for commercial purposes.  And this goes on in

6    the complaint.

7            Paragraph 15:  The defendant Snap -- and when we say

8    what the defendant Snap did, we're also saying that -- that

9    Emily White and Mr. Spiegel where the ones who directed,

10   controlled, and -- and -- and participated in all of this

11   activity.  So Defendants Snap incentivized and rewarded the

12   users -- rewarding them, those who use speed filter in

13   excessive and dangerous ways.

14           And then we have the allegations of negligence,

15   creating the speed filter to the driver; the occupant.  We've

16   alleged that this is activity purposely availing Snap -- Snap

17   to South Carolina drivers.  And that is -- is activity of the

18   defendants, Emily White and Mr. Spiegel.

19           So I think that when you read the complaint, if

20   you -- if you don't realize that what is really being said in

21   the complaint is that -- that all of this activity is -- of the

22   defendants White and Siegel is the same activity that's

23   complained of in the complaint, you might be able to say they

24   didn't -- we didn't allege that.  But we have alleged

25   specifically that they -- they engaged in all activity.  I

1    think that we need the cast -- *Magic Toyota*.  And I just got

2    this new -- new case, *Gault*, today.  But it doesn't look like

3    it really applies.  It looks like *Magic Toyota* would be the

4    case as far as the individual defendants go.

5            **THE COURT:**  Thank you.

6            **MR. HAMMER:**  Thank you, Your Honor.

7            **MR. DUFFY:**  Your Honor, can I add some clarification

8    to whether they've -- they've been pressing their motion for

9    jurisdictional discovery which I respond to or is more coming

10   from that?

11           **THE COURT:**  Are we all done with White and Spiegel?

12           **MR. DUFFY:**  So I just didn't know part of that

13   argument was -- was advancing that motion, which I need to

14   respond to.  Otherwise, Mr. Daniels is ready.

15           **MR. GERGEL:**  Just one more point in regard to

16   Ms. White and Mr. Spiegel and the fact that we've allege their

17   direct participation and control.  When you look at their

18   affidavits, they say they don't have a bank account in South

19   Carolina.  They don't own property in South Carolina.  They

20   don't deny that they directed and controlled or participated in

21   the activities that we've alleged.  That would be a pretty

22   straightforward and obvious thing to deny, or at least clarify

23   in the affidavit.  I'd just like to point the Court -- point

24   that out to the Court.

25           **MR. DANIEL:**  Thank you, Your Honor.  Just very

1  briefly.  Wilson Daniel, again, here on behalf of Snap.

2  Your Honor, that -- the arguments in favor of jurisdiction over

3  Mr. Spiegel and Ms. White focused a lot on the level of control

4  that Mr. Spiegel and Ms. White allegedly exercised over Snap,

5  over the -- the speed filter.  But that's not what the law

6  focuses on.  That's not what the jurisdictional analysis focus

7  on.  The jurisdictional analysis focuses on the -- the

8  allegations of -- of directed -- intentionally and purposefully

9  directed conduct towards South Carolina.  And there's nothing

10  like that in the complaint, Your Honor.

11          Exercising control over Snap or over the speed filter

12  does not amount to directing contact towards South Carolina.

13  The fact that those things are available in South Carolina does

14  not constitute, you know, Mr. Spiegel or Ms. White availing

15  themselves of the privilege of conducting business in

16  South Carolina.  It -- it -- it has nothing to do with the

17  jurisdictional analysis.

18          And finally, Your Honor, Mr. Hammer brought up the

19  *Magic Toyota* case, which is another case from -- from Your

20  Honor.  And -- and that's -- that's a great case to -- to read,

21  because it focuses on the -- on the guiding spirit doctrine.

22  And I just want to read one quote what the court said in that

23  case, quote:  An agent who takes purposeful and calculated

24  action against a plaintiff in a particular forum -- forum,

25  fully conscious of the consequences of his actions, should be

1    amenable to suit in that forum.  Those defendants there, quote,

2    had reason to foresee responsibility in South Carolina for

3    their unlawful actions.

4          And -- and Your Honor, that case involves some

5    out-of-state plaintiffs who allegedly conspired to destroy a

6    South Carolina business.  Reached into South Carolina to

7    destroy a car dealership that was in Beaufort when it tried to

8    exercise control over that dealership.  And the dealership

9    rejected.  So that was -- that was clear direction of torturous

10   activity specifically directed into South Carolina.  It was

11   purposeful.  It was intentional, rather than sort of just

12   exercising control of a -- of a product that -- that ends up in

13   the forum state.  That's a different issue.  And it's not

14   purposeful availment.  With that, Your Honor, I'm happy to

15   answer any questions.

16          **THE COURT:**  All right.

17          Thank you.

18          **MR. DANIEL:**  Thank you.

19          **THE COURT:**  All right.

20          Is that it for the motions?  Jurisdictional

21   (inaudible).

22          **MR. GERGEL:**  Your Honor --

23          **THE COURT:**  Yeah.

24          **MR. GERGEL:**  -- we think that our arguments set forth

25   so far are sufficient.  But if you'd like to hear more in

1  regards to our motion for jurisdictional discovery, we're happy

2  to -- to do that.

3       **MR. DUFFY:** I -- I would like to address that motion.

4  If Your Honor was asking earlier --

5       **THE COURT:** Well, you're -- you're gonna say none;

6  he's gonna say same.

7       **MR. DUFFY:** Right. But I want to explain why there

8  should be none.

9       **THE COURT:** All right.

10      Well, go ahead with jurisdiction discovery. And then

11 you can respond.

12      Mr. Duffy.

13      **MR. DUFFY:** Thank you, Your Honor.

14      The whole point of jurisdictional discovery would be

15 to try to -- to explore a particular contact that they think

16 might exist. But what we've continually heard and, you know,

17 my very capable counsel and friends on the other side are --

18 are -- are working with what they can in this case. But

19 they're arguing for a -- exactly what the Supreme Court said

20 not to have, which is a loose, spurious, general jurisdiction.

21 They keep describing everything the app does, and all the

22 things that the user to do. Well, that's true what they do

23 everywhere. And that's what all these apps do everywhere. And

24 it does -- they're missing the point of the limitations of

25 personal jurisdiction. Just because something has an effect

1   here, because a user uses it, doesn't mean that the defendant,

2   nationwide defendant, purposely avail themselves and had

3   forum-related activities in the state.

4        And the jurisdictional discovery doesn't even seek

5   that, Your Honor. I mean, they -- what they say they want in a

6   jurisdictional discovery is, for example, the role they had in

7   providing the speed filter focused on users in all 50 states,

8   targeted and unsolicited users, generally from all 50 states,

9   including from South Carolina. These are not things related to

10   purposely availing oneself of jurisdiction in South Carolina.

11   This is just how the nationwide app works.

12        Was there something wrong with it that may have given

13   rise to this? That might be a claim, but it's not one in South

14   Carolina. Because it's not -- it's not activity directed to

15   South Carolina. And -- and so what I'm saying, Your Honor, is,

16   you know, relationship and contracts between Snap and Google

17   and Amazon and Apple and like entities, what in the world are

18   we going to do on jurisdictional discovery that has anything to

19   do with whether the defendants acted in forum-related conduct

20   in South Carolina?

21        You know, I'll -- I'll go back to specifically what

22   they say they're asking in the incident case. This is in their

23   motion on -- in the summary on page eight. Defendants and

24   plaintiffs have offered conflicting assertions regarding

25   defendants' South Carolina contacts. Defendants assert there

1   are no relevant contacts.  True.

2          Plaintiffs assert Snap contracted with South Carolina

3   residents.  Not relevant.  Not relevant.  This isn't a contract

4   claim.

5          Collected data from South Carolina.  Again, not

6   relevant.  Collecting the data did not cause the driving

7   accidents.

8          And targeted South Carolina residents with

9   location-based advertising.  First of all, it's third parties

10  who do it and who do the targeting.  Snap doesn't even say here

11  is a South Carolina package.  They offer a variety of things

12  people can check on how age, interests, location.  The third

13  parties decide all of this anyway.  But even so, the -- the --

14  the ads or the use of Snapchat itself is not what's at issue.

15  It is --

16          **THE COURT:**  So the third parties get the information

17  that Snap collects.  And then they do a target --

18          **MR. DUFFY:**  And none of it's by the speed filter.

19  And that's what the affidavits direct.  Yeah.  Sure.  That's

20  how all these apps work, Your Honor, all across the world, all

21  of them.  And it doesn't subject them to jurisdiction all

22  across the world.  There -- that's the whole -- that's why I

23  wanted to focus on the federalism concepts at the very

24  beginning.  Because that's what's being missed in arguments

25  here that because this had some impact and because they have

1     contact with South Carolina people that means for this claim,

2     there's jurisdiction.  And there isn't.

3          And the -- I'd already -- already directed Your Honor

4     to their -- to their reply at page three, where they describe

5     the related contact as providing the speed filter.  Again,

6     that's -- that is a user's direction of a

7     universally-applicable app.  It's not purposeful availment from

8     the defendant.

9          Your Honor, the cases make clear that if there's no

10    concrete proffer for -- or -- or by the plaintiffs or some

11    suggestion of fraud in the affi- -- jurisdictional affidavits

12    from the defendant, and essentially no information that they

13    can identify that would alter the analysis, there shouldn't be

14    discovery.  And that -- and if it's based simply on their

15    allegations of jurisdictional contact, or conclusory ones,

16    which is certainly what we have here, then the contact -- I

17    mean, the jurisdictional discovery is not appropriate.  Thank

18    you.

19          **THE COURT:**  Thank you.

20          **MR. GERGEL:**  So listening to the arguments that

21    something that I've heard several times is that whatever Snap

22    might have been directing to South Carolina wasn't different

23    than they were directing to other jurisdictions.  That's sort

24    of a common thread.  And what I'd just like to point out is

25    there was nothing about the UMG website that was specifically

1    designed for Virginia.  It wasn't a Virginia edition of that

2    website.  There wasn't a Montana edition of the F-150 in the

3    Ford case.  There wasn't a Rhode Island edition of Hustler.

4    That's not what's required.  It's directed toward the state,

5    not directly with special tools designed specifically for that

6    state.

7          And again, our jurisdiction arguments and our request

8    for jurisdictional discovery are not directed to what a user

9    might have been doing unilaterally.  They are directed to what

10   Snap is doing with the user's activity once the user has -- has

11   started using Snap and engages with other content on Snap.  And

12   Snap is collecting that user data and using that collected data

13   to direct advertisements into the forum.

14         Snap says contracts were irrelevant.  However, they

15   also say that in UMG, it's a different case because UMG had

16   servers in Virginia.  Something that we're looking for is

17   whether Snap operates off of servers or other infrastructure in

18   South Carolina.  The UMG court considered that a

19   jurisdictionally-relevant fact.  And certainly, that would

20   suggest that they're trying to avail themselves to the state

21   if -- if they're trying to speed up load times and use servers

22   to further their infrastructure in the state.

23         The -- lots of the topics that we've identified is

24   matters for jurisdictional discovery -- and this is not an

25   exhaustive list -- are specific things that the UMG court

1     looked at and said are evidence of jurisdiction.  The contracts

2     with the forum state users, the UMG court specifically analyzed

3     the terms of service.  That's something that we're looking at

4     it because we believe those terms of service will show that

5     Snap entered into agreements that allow them to track the

6     activities of every South Carolina user.  So that's one that's

7     taken directly from your UMG's jurisdictional analysis.

8            That -- data collection practices, that's also taken

9     directly from the UMG analysis.  And the location-based adds, I

10    probably don't need to tell the Court, that's also taken from

11    UMG's analysis.  There's not much daylight between what we're

12    asking for and what the Court looked at in UMG.  We are not

13    asking the Court to go any further than what the UMG Court did

14    in our discovery directly to those matters.

15            **THE COURT:**  Thank you.

16            And Mr. Duffy.

17            **MR. DUFFY:**  Your Honor, I mean, this -- the -- the

18    UMG conduct was actionable.  That's what they're related to the

19    claim.  That's what (inaudible).

20            **THE COURT:**  Okay.

21            Anything else from anybody else about anything else?

22            **MR. DANIEL:**  Yes, Your Honor.  If I may, just -- just

23    one point on the motion for jurisdictional discovery with

24    respect to the --

25            **THE COURT:**  Sure.

1     **MR. DANIEL:** -- with respect to the individual

2     defendants.  The Court should deny that plaintiffs' request

3     with respect to Mr. Spiegel and -- and Ms. White for two

4     reasons.  The first is that the plaintiffs have not made a

5     prima facia showing of personal jurisdiction with respect to

6     Ms. White and Mr. Spiegel.  And that's one of the reasons that

7     I have discussed.  Because there are no allegations that amount

8     to purposeful availment.  There's no allegations that Mr. --

9     Mr. Spiegel or Ms. White directed activities toward South

10    Carolina.

11         And -- and the law on that front, Your Honor, this is

12    a Fourth Circuit case, *McLaughlin versus McPhail*.  And this is

13    what that case says.  It says:  "Jurisdictional discovery is

14    warranted only if the plaintiff is able to make prima facia

15    claim to personal jurisdiction.  Without a prima facia claim,

16    jurisdictional discovery is inappropriate."

17         And -- and the second point, Your Honor, is just to

18    reiterate that all the points that Mr. Duffy made apply with

19    equal force to -- to Mr. Spiegel and Ms. White.  Even if there

20    is -- you know, if the Court finds there's some purposefully

21    availing activity, no amount of jurisdictional discovery is

22    going to create a connection between the purposefully availing

23    activity and -- and the plaintiffs' claim here.  That's all,

24    Your Honor.  Thank you.

25         **THE COURT:**  Anything else?

1          All right.  Thank you very much.

2

3                    *********

4              C E R T I F I C A T E

5      I, Teresa B. Johnson, Official Reporter for the U.S.

6  District Court, District of South Carolina, hereby certify that

7  the foregoing is a true and correct transcript of the

8  electronically-recorded above proceedings, to the best of my

9  ability.

10

11  /s/Teresa B. Johnson                    07/03/2024

12  Teresa B. Johnson, CVR-M-CM, RVR, RVR-M          Date

13

14

15

16

17

18

19

20

21

22

23

24

25