**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| JEREMY PAUL BATTS, and | ) | |
| SUSAN BETH BATTS, *as* | ) | |
| *Co-Personal Representatives of the* | ) | |
| *Estate of Kaiea Spring Batts, deceased*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 2:23-cv-03565-DCN |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| SNAP Inc., *d/b/a SNAPCHAT, Inc.*, | ) | |
| EVAN SPIEGEL, and EMILY WHITE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on plaintiffs Jeremy Paul Batts and Susan Beth Batts's (together, "plaintiffs") motion for jurisdictional discovery, ECF No. 22, and on defendants SNAP Inc. ("Snap"), Evan Spiegel ("Spiegel"), and Emily White's ("White") (collectively, "defendants") motion to dismiss, ECF No. 35. The court finds that jurisdictional discovery is warranted before the court can rule on whether it has personal jurisdiction over Snap. The court therefore orders that jurisdictional discovery take place as to Snap and defers ruling on the portions of the motion to dismiss related to Snap until after that discovery has taken place. The court further finds that it does not have personal jurisdiction over Spiegel or White and, accordingly, dismisses these two defendants without jurisdictional discovery. Thus, the court is granting in part and deferring ruling on in part defendants' motion to dismiss, and the court is granting in part and denying in part plaintiffs' motion for jurisdictional discovery.

1

# I.  BACKGROUND

This case arises from a fatal automobile accident.  Plaintiffs allege that out-of-state defendants prompted the accident by making a social media application available, via the internet, to users in this state and that the application encourages drivers to travel at excessive speeds.  At base, the issue presently before the court is whether plaintiffs' allegations are sufficient to subject the foreign defendants to this court's jurisdiction.  The court begins by providing background on the application, the plaintiffs' claims, and the procedural history of this case.

## A.  Snapchat

Snap is the developer of the Snapchat mobile application.  ECF Nos. 23 at 3; 35 at 3.[1]  Snapchat is a social media platform, on which users can send each other photos or short videos called "snaps."  ECF Nos. 23 at 3; 35 at 3–4.  Users can edit or modify snaps by drawing on the images or adding decoration.  ECF Nos. 23 at 3; 35 at 3–4.  One way of modifying snaps is by adding a "filter."  ECF Nos. 23 at 3; 35 at 3–4.  A filter is a visual overlay that sits on top of the snap.  ECF Nos. 23 at 3; 35 at 3–4.  For instance, some filters add information about when or where the photo or video was taken, such as a timestamp, the altitude, or the temperature.  ECF No. 35 at 4.

This case specifically concerns a filter that displays a speedometer showing how fast the user was traveling when the snap was taken (the "Speed Filter").  See ECF Nos. 23 at 4; 35 at 4.  Snap asserts that, despite being styled as a speedometer, "[t]he Speed

---

[1] The facts taken from plaintiffs' response to defendants' original motion to dismiss, ECF No. 23, and from defendants' memo in support of their motion to dismiss plaintiffs' amended complaint, ECF No. 35, are provided in this section only for purposes of aiding an understanding of plaintiffs' allegations.

Filter is not designed for use while driving, or while performing any particular activity; users can use the Speed Filter while, for example, taking a flight, jogging, riding a train, or even sitting still." ECF No. 35 at 4. Plaintiffs, on the other hand, allege that the Speed Filter incentivizes users to drive at excessive and dangerous rates of speed by, among other means, awarding users "trophies" and other awards. ECF No. 38, Amend. Compl. ¶¶ 5, 12–16, 18, 22.

### B. Plaintiffs' Allegations[2]

Kaiea Spring Batts ("Kaiea") was plaintiffs' daughter. Amend. Compl. ¶ 1. On or about June 17, 2021, Kaiea was a passenger in an automobile in South Carolina that was traveling at "an extremely high and dangerous rate of speed." Id. ¶ 17. Tragically, the automobile crashed, and Kaiea was killed in the accident. Id. Immediately before the accident, "at least one occupant [in the vehicle was] using Snapchat and at least one occupant . . . had previously used Snapchat Speed Filter and was using and/or preparing to use Speed Filter." Id.

Also relevant for the court's present purposes, plaintiffs allege that Snap is incorporated in California but that it makes Snapchat available to users in South Carolina. Id. ¶¶ 2, 10–12. Snap contracted with South Carolina users and gained the authority to track these users' location data and other data for commercial purposes. Id. ¶ 4. Snap then sold location-based advertisements specifically targeting users in South Carolina.

---

[2] The facts in this section are taken from plaintiffs' amended complaint and are presumed as true for purposes of adjudicating defendants' motion to dismiss. See Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226 (4th Cir. 2019) (explaining that courts must assume facts proffered by the plaintiff are true when disposing of both motions to dismiss under Rule 12(b)(6) and those brought under Rule 12(b)(2) prior to an evidentiary hearing).

3

Id. Spiegel and White are corporate executives at Snap, who directed this activity and exerted a high degree of corporate control over Snap. Id. ¶ 5. Neither Spiegel nor White are residents of South Carolina. Id.

### C. Procedural History

Plaintiffs filed this lawsuit on July 24, 2023. ECF No. 1, Compl. Defendants originally filed their motion to dismiss on September 25, 2023, ECF No. 13, and plaintiffs filed their motion for jurisdictional discovery on November 21, 2023, ECF No. 22.

On March 12, 2024, the parties filed a consent motion to amend the complaint to clarify some of the factual allegations, and the parties proposed that both defendants' motion to dismiss and plaintiffs' motion for jurisdictional discovery be re-briefed according to those new factual allegations. ECF No. 32. The court granted the motion to amend on March 12, 2024, ECF No. 33, and plaintiffs subsequently filed their amended complaint, ECF No. 38, Amend. Compl., which is now the operative complaint. They assert two causes of action against all three defendants: (1) negligence and (2) strict liability/ultra hazardous activity. Amend. Compl. ¶¶ 9–22.

On March 29, 2024, in accordance with the terms of the court's order on the consent motion to amend, defendants filed both a new motion to dismiss the amended complaint, ECF No. 35, and a response in opposition to plaintiffs' motion for jurisdictional discovery, ECF No. 36.[3] Plaintiffs then filed a response in opposition to the

---

[3] In other words, defendants' original motion to dismiss, ECF No. 13, was replaced with a new filing, ECF No. 35. However, plaintiffs' original motion for jurisdictional discovery, ECF No. 22, remains operative, as it was not replaced with a new filing, and the parties simply supplied supplemental briefing for and against this motion.

4

motion to dismiss the amended complaint and in support of jurisdictional discovery on
April 12, 2024, ECF No. 37, to which defendants replied on April 19, 2024, ECF No. 40.
On June 20, 2024, the court held a hearing, during which it heard arguments from the
parties on the jurisdictional issues presented in the pending motions.[4]  ECF No. 47.  As
such, both motions are fully briefed, and the jurisdictional issues presented therein are
now ripe for the court's review.

## II.  STANDARD

A party may challenge the court's power to exercise personal jurisdiction over it
through a motion under Federal Rule of Civil Procedure 12(b)(2).  "When a court's
personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional
question thus raised is one for the judge, with the burden on the plaintiff ultimately to
prove the existence of a ground for jurisdiction by a preponderance of the evidence."
Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989).  However, the plaintiff's burden
when confronted with a particular jurisdictional challenge varies depending on the stage
of the litigation, the posture of the case, and the evidence before the court.  Id.; Grayson
v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016); Sec. & Exch. Comm'n v. Receiver for
Rex Ventures Grp., LLC, 730 F. App'x 133, 136 (4th Cir. 2018).

---

[4] Defendants' motion to dismiss is based on both personal jurisdiction grounds
and on failure to state a claim grounds.  ECF No. 35.  However, because the court must
have jurisdiction before it can rule on the merits of plaintiffs' claims, the court focused
arguments at the hearing, and focuses this order, on only the pending jurisdictional
questions.  See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999) ("Personal
Jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without
which the court is 'powerless to proceed to an adjudication.'" (second alteration in
original) (quoting Employers Reinsurance Corp. v. Bryant, 299 U.S. 374, 382 (1937));
see also, e.g., Bays v. Corcell Inc., 2012 WL 1616746, at *9 n.3 (S.D.W. Va. May 8,
2012) (holding a Rule 12(b)(6) motion in abeyance until resolution of pending personal
jurisdiction challenge).

When a court rules on a personal jurisdiction issue presented in a pretrial motion prior to holding an evidentiary hearing, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." Combs, 886 F.2d at 676. In such circumstances, much like when reviewing motions made pursuant to Rule 12(b)(6), "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id. "In doing so, however, the court need not 'credit conclusory allegations or draw farfetched inferences.'" Masselli & Lane, PC v. Miller & Schuh, PA, 215 F.3d 1320 (4th Cir. 2000) (unpublished table decision) (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)). "Unlike under Rule 12(b)(6), the court may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." Hawkins, 935 F.3d at 226.

If the plaintiff's allegations are sufficient to make a prima facie case for personal jurisdiction, the court may deny the Rule 12(b)(2) motion and later revisit the question or defer ruling on the motion until the parties have had the opportunity to develop the factual record. Combs, 886 F.2d at 676; Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 196–97 (4th Cir. 2018); Mylan Lab'ys Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). District courts have broad discretion to allow discovery to help resolve personal jurisdiction issues, Mylan Lab'ys, 2 F.3d at 64, and jurisdictional discovery should normally be permitted "[w]hen the Plaintiff's claim does not appear to be frivolous," Cent. Wesleyan Coll. v. W.R. Grace & Co., 143 F.R.D. 628, 644 (D.S.C.

6

1992), <u>aff'd</u> 6 F.3d 177 (4th Cir. 1993).  Yet, "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery."  <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.</u>, 334 F.3d 390, 402 (4th Cir. 2003); <u>see also</u> <u>Pandit v. Pandit</u>, 808 F. App'x 179, 183 (4th Cir. 2020) ("Jurisdictional discovery is proper when the plaintiff has alleged sufficient facts to suggest the possible existence of personal jurisdiction.").  Moreover, "[a] party is not entitled to discovery that would be futile or otherwise inadequate to establish a sufficient basis for jurisdiction."  <u>Seaside Farm, Inc. v. United States</u>, 842 F.3d 853, 860 (4th Cir. 2016).  Once the factual record is developed and presented to the court, either at an evidentiary hearing or at trial, the plaintiff has the burden of proving facts supporting jurisdiction by a preponderance of the evidence.  <u>Grayson</u>, 816 F.3d at 268.

### III.  DISCUSSION

Plaintiffs' theory of personal jurisdiction in this case primarily revolves around the prevalence and availability of Snapchat in South Carolina and specifically Snap's targeted, location-based advertising in South Carolina.  ECF No. 37 at 5–6.  They argue these contacts are sufficient for this court to establish personal jurisdiction over Snap as well as Spiegel and White because Spiegel and White directed Snap's activities.  <u>Id.</u> at 8–10.  Ultimately, the court finds that plaintiffs have made the requisite showing to proceed to jurisdictional discovery against Snap but not Spiegel or White.  To explain its reasoning, the court will begin by analyzing the jurisdictional considerations related to Snap.  After that, the court will analyze the portion of the motions related to Spiegel and White.

### A. Snap

To determine whether plaintiffs "alleged sufficient facts to suggest the possible existence of personal jurisdiction," Pandit, 808 F. App'x at 183, the court will first review what plaintiffs must show. After that, the court will outline the parties' arguments. Finally, the court will conclude by discussing what additional information is needed to ultimately determine whether the court has personal jurisdiction.

#### 1. Standard

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Thus, in evaluating a challenge to personal jurisdiction, the court engages in a two-step analysis. Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). First, it must find that the forum state's long-arm statute authorizes the exercise of jurisdiction under the facts presented. Id. Second, if the statute does authorize jurisdiction, then the court must determine if its exercise of personal jurisdiction is consistent with due process. Id. South Carolina's long-arm statute extends its reach to the outer limits allowed by the Due Process Clause. Foster v. Arletty 3 Sarl, 278 F.3d 409, 414 (4th Cir. 2002); Cockrell v. Hillerich & Bradsby Co., 611 S.E.2d 505, 508 (S.C. 2005); see S.C. Code Ann. § 36-2-801, et seq. Consequently, the two-step inquiry compresses into a single question: whether the court's exercise of personal jurisdiction comports with due process. Maseng v. Lenox Corp., 483 F. Supp. 3d 360, 364–65 (D.S.C. 2020).

Personal jurisdiction over a nonresident defendant can be either specific or general. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).

8

General jurisdiction arises when the nonresident defendant's contacts with the forum state "are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State." Id. (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)). General jurisdiction may be exercised even when the suit is unrelated to the defendant's contacts within the forum state. See S.C. Code Ann. § 36-2-802; Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 416 (1984). In this case, plaintiffs do not argue that the court has general jurisdiction, see ECF No. 37, so the court focuses its analysis only on specific jurisdiction.

In contrast to general jurisdiction, specific jurisdiction may only be exercised when a cause of action is related to the defendant's activities within the forum state. See S.C. Code Ann. § 36-2-803; Helicopteros Nacionales, 466 U.S. at 416. Exercising specific jurisdiction does not comport with due process unless the defendant has purposefully established sufficient "minimum contacts" with the forum state and the exercise of jurisdiction comports with notions of "fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76 (1985). A defendant has minimum contacts with a state when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Minimum contacts must be based on "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475. Upon a showing of the defendant's purposeful availment, the fairness inquiry balances any burden on the defendant against countervailing concerns such as the plaintiff's interest in obtaining

relief and the forum state's interest in the controversy. <u>World-Wide Volkswagen</u>, 444 U.S. at 292.

Thus, courts apply a three-part test when evaluating the propriety of a court exercising specific jurisdiction: (1) whether the defendant purposely availed itself of the privileges of conducting activities in the forum state and thus invoked the benefits and protections of its laws, (2) whether the plaintiff's claims arise out of or relate to those forum-state activities, and (3) whether the exercise of jurisdiction is constitutionally reasonable. <u>Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan</u>, 259 F.3d 209, 215–16 (4th Cir. 2001). "If the plaintiff meets the first two prongs, then the burden shifts to the defendant to show that exercising jurisdiction would be unreasonable." <u>White ex rel. White v. Aetna Life Ins. Co.</u>, 519 F. Supp. 3d 253, 259 (W.D.N.C. 2021). The plaintiff must ultimately prevail on all three prongs to show that the exercise of specific jurisdiction over a defendant comports with due process. <u>Perdue Foods LLC v. BRF S.A.</u>, 814 F.3d 185, 189 (4th Cir. 2016).

The Fourth Circuit generally determines whether a nonresident defendant purposefully availed itself of the privilege of conducting business in a forum state by looking to a list of several nonexclusive factors:

> (1) "whether the defendant maintains offices or agents in the forum state;" (2) "whether the defendant owns property in the forum state;" (3) "whether the defendant reached into the forum state to solicit or initiate business;" (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state;" (5) "whether the parties contractually agreed that the law of the forum state would govern disputes;" (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;" (7) "the nature, quality and extent of the parties' communications about the business being transacted;" and (8) "whether the performance of contractual duties was to occur within the forum."

Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 560 (4th Cir. 2014) (quoting

Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009)).  "A

defendant's actions that are directed at the forum state in only 'a random, fortuitous, or

attenuated way' are insufficient to support jurisdiction."  ESAB Grp., Inc. v. Zurich Ins.

PLC, 685 F.3d 376, 392 (4th Cir. 2012) (quoting ESAB Grp., Inc. v. Centricut, Inc., 126

F.3d 617, 625 (4th Cir. 1997)).

These same traditional due process principals apply to questions of internet-based

contacts.  ALS Scan, Inc. v. Digit. Servs. Consultants, 293 F.3d 707, 713–14 (4th Cir.

2002); Young v. New Haven Advoc., 315 F.3d 256, 263 (4th Cir. 2002); see also

Intercarrier Commc'ns, LLC v. Wattsapp Inc., 2013 WL 5230631, at *2–6 (E.D. Va.

Sept. 13, 2013) (generally applying the same due process considerations to mobile

applications).  In such cases, there are "limited circumstances" in which an out-of-state

defendant can be considered to have "conceptually 'entered' the State via the Internet for

jurisdictional purposes."  ALS Scan, 293 F.3d at 713.  The Fourth Circuit has made clear

that "a person who simply places information on the Internet does not subject himself to

jurisdiction in each State into which the electronic signal is transmitted and received."  Id.

at 714.  Otherwise, "the defense of personal jurisdiction, in the sense that a State has

geographically limited judicial power, would no longer exist," id. at 712, "and the

traditional due process principles governing a State's jurisdiction over persons outside of

its borders would be subverted," Young, 315 F.3d at 263.

In ALS Scan, the court "adopted and adapted" the Zippo sliding scale test for

assessing whether a defendant's internet-based conduct is sufficient to constitute

minimum contacts with the forum state.[5]  ALS Scan, 293 F.3d at 713–14 (citing Zippo

Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)).  Under this test,

"the likelihood that personal jurisdiction can be constitutionally exercised is directly

proportionate to the nature and quality of commercial activity that an entity conducts over

the Internet."  Id. at 713 (quoting Zippo, 952 F. Supp. at 1124).

> At one end of the spectrum are situations where a defendant clearly does business over the Internet.  If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.  At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions.  A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.  The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.  In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

Id. at 713–14 (alteration in original) (quoting Zippo, 952 F. Supp. at 1124).

> In adopting this test, the Fourth Circuit explained that

> a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other

---

[5] The court explained in ALS Scan, that the Zippo test should be used "[u]ntil the due process concepts of personal jurisdiction are reconceived and rearticulated by the Supreme Court in light of advances in technology."  ALS Scan, 293 F.3d at 713.  Since then, the Supreme Court has suggested that additional considerations may be relevant when assessing virtual, internet-based contacts but has, thus far, not provided an alternative test.  See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 366 n.4 (2021) ("And we do not here consider internet transactions, which may raise doctrinal questions of their own."); Walden v. Fiore, 571 U.S. 277, 290 n.9 (2014) ("[T]his case does not present the . . . questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State[, and w]e leave questions about virtual contacts for another day."); see also J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 887 (2011) (Breyer, J., concurring in judgment) ("I do not doubt that there have been many recent changes in commerce and communication, many of which are not anticipated by our precedents.  But this case does not present any of those issues.").

interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

Id. at 714.  Since deciding ALS Scan, the Fourth Circuit has continued to apply the Zippo sliding scale test and has reinforced that, to support jurisdiction under this test, a defendant must, through his internet activity, "manifest an intent to target and focus on" users in the forum state.  See, e.g., Young, 315 F.3d at 236; accord Carefirst of Md., 334 F.3d at 400; Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 141 (4th Cir. 2020).

Notably, the Fourth Circuit recently considered how websites' collection and sale of location data for advertising purposes fits into the specific jurisdiction analysis.  In UMG Recordings, Inc. v. Kurbanov, the court applied a highly fact-specific analysis and determined that a Virginia court had personal jurisdiction over a Russian website developer in a copyright infringement case.[6]  963 F.3d 344, 347–48 (4th Cir. 2020). Tofig Kurbanov ("Kurbanov") lived in Russia and developed websites that allowed users to download "stream-ripp[ed]" music.  Id. at 348.  The websites were free to use, and Kurbanov generated revenue by selling advertising space on the website.  Id.  He sold the

---

[6] Before engaging in this fact-specific analysis, the Fourth Circuit explained that websites at issue in UMG Recordings were "certainly interactive to a degree" but held that the level of interactivity was "not determinative for purposes of personal jurisdiction."  UMG Recordings, 963 F.3d at 353.  While the Fourth Circuit went on to express its concerns with the Zippo sliding scale, it did not overturn ALS Scan.  See UMG Recordings, 963 F.3d at 352–53.  Indeed, the Fourth Circuit had expressed the same criticisms of the Zippo test in Fidrych, 952 F.3d at 141–42 & n.5, three months before deciding UMG Recordings.  Nevertheless, the court noted in Fidrych that the Zippo test remains binding precedent in this circuit until it is revisited by either the Fourth Circuit en banc or the Supreme Court.  See Fidrych, 952 F.3d at 141 n.5 (citing United States v. Bush, 944 F.3d 189, 195 (4th Cir. 2019)).  Consequently, both ALS Scan and UMG Recordings are binding precedent on this court, and resolving the jurisdictional questions in this case thus requires an analysis under both ALS Scan (and its progeny) and a comparison against the facts of UMG Recordings.  See, e.g., Lane v. Gray Transp., Inc., 2021 WL 4392667, at *5–6 (N.D.W. Va. Sept. 24, 2021); Conopco, Inc. v. Rebel Smuggling, LLC, 2021 WL 5909831, at *3–4 (E.D. Va. Dec. 14, 2021).

space to advertising brokers, who in turn sold those spaces to advertisers, and some of the advertisers and brokers used location-targeting technology to target ads to specific geographic areas.  Id.  Kurbanov's websites were accessible all over the world.  Id. at 349.  About 10% of their traffic came from the United States, and 2% of that American traffic came from Virginia, which made Virginia one of the top thirteen states in the country in terms of number of users of the websites.  Id.

Despite Kurbanov performing all his work on the websites while located in Russia, the Fourth Circuit determined that Kurbanov had purposefully availed himself of the privilege of conducting business in Virginia.  Id. at 349, 353.  In reaching this determination, the court focused on the fact that Kurbanov had created a commercial relationship with Virginia customers through the website.  Id. at 349, 353.  It was immaterial to the court that Kurbanov did not charge customers directly because he was making money by collecting customer data and selling that data to advertising brokers, who used the data to facilitate geographically targeted ads.  Id. at 353–54.  Thus, the court specifically rejected Kurbanov's argument that he lacked control over the advertising displayed on his website due to his relationship with the brokers because "the fact remain[ed] that he earn[ed] revenues precisely because the advertising [was] targeted to visitors in Virginia."  Id. at 354.

The court further explained that Kurbanov had registered an agent with the U.S. Copyright Office, "contracted with U.S.-based advertising brokers, registered his Websites with U.S.-based domain registers, and until recently relied on U.S.-based servers."  Id.  The court noted that that these facts would not "be individually sufficient to confer specific personal jurisdiction, but when viewed in the context of other

14

jurisdictionally relevant facts, they contradict Kurbanov's contention that he could not have anticipated being haled into court in Virginia." Id. Thus, the court found that Kurbanov, through his websites, had purposefully availed himself of the privilege of conducting business in Virginia. Id.

The court also found, based largely on some of the same factual considerations, that the plaintiffs' copyright infringement claims arose out of Kurbanov's contacts with Virginia. Id. at 354. The court explained that Kurbanov's location-based advertising formed the basis of the patent infringement claims against him because "Kurbanov knew the Websites were serving Virginian visitors and yet took no actions to limit or block access, all while profiting from the data harvested from the same visitors." Id. The court explained that "Kurbanov actively facilitated the alleged music piracy through a complex web involving Virginia visitors, advertising brokers, advertisers, and location-based advertising." Id. at 355. In other words, Kurbanov engaged in commercial activity that gave rise to the copyright infringement claims against him by selling Virginians information to the brokers, and by profiting from that sale.[7] UMG Recordings, 963 F.3d at 355.

## 2. Arguments

In short, Snap argues that this court does not have personal jurisdiction over it. It starts with the assertion that Snapchat's mere availability in South Carolina, without

---

[7] The Fourth Circuit remanded the case back to the district court to determine whether it would be constitutionally reasonable to exercise jurisdiction. UMG Recordings, 963 F.3d at 355. On remand, the district court for the Eastern District of Virginia found that exercising jurisdiction was reasonable. UMG Recordings, Inc. v. Kurbanov, 2021 WL 1206797, at *3 (E.D. Va. Mar. 30, 2021). The case was then dismissed before the Fourth Circuit could hear an appeal of that decision. See UMG Recordings, Inc. v. Kurbanov, 2023 WL 9338779 (4th Cir. Aug. 8, 2023).

more, is not sufficient to establish personal jurisdiction.  ECF No. 35 at 11–13.  The court agrees with this general proposition, but rather than ending the court's inquiry, this conclusion merely focuses the remaining analysis on the question of whether Snap specifically "manifest[ed] an intent to target and focus on" users in South Carolina.  See Young, 315 F.3d at 263; accord Carefirst of Md., 334 F.3d at 401; Fidrych, 952 F.3d at 142–43.

Snap next argues that it has not engaged in any activity to deliberately target users in South Carolina, and it points to affidavits by various corporate officers in support of this assertion.  ECF No. 35 at 13–16.  For instance, it relies on an affidavit provided by Jonathon Locascio ("Locascio").  Id. at 14.  Locascio is Snap's Vice President of Tax.  ECF No. 13-1, Locascio Aff. ¶ 5.  He testified that Snap does not have any offices, facilities, property, or bank accounts in South Carolina.  Id. ¶¶ 15–17.  He also claims that Snap "does not specifically recruit or solicit users from South Carolina, earn revenue through tools specifically designed to target South Carolina users, or otherwise focus or target its operations towards South Carolina residents."  Id. ¶ 19.  Snap also points to Spiegel's and White's affidavits, ECF No. 35 at 14, in which Spiegel and White similarly testified that Snap does not specially target users in South Carolina, ECF No. 13-2, Spiegel Aff. ¶ 8; ECF No. 13, White Aff ¶ 7.

Snap acknowledges that it deals in location-based advertising.  ECF No. 35 at 15.  However, it contends that these ads are third-party ads.  Id.  It argues that, even if these ads target South Carolina users, it is the third-party advertisers who are targeting those users, not Snap.  See id.  Snap also asserts that location-based advertisement is driven by the user because it is the user, not Snap, who controls where she uses her device.  Id.

Snap points to cases outside of this circuit for its proposition that location-based advertising alone is not sufficient for purposeful availment.  Id.  Snap also argues that, even if its advertising could constitute purposeful availment in South Carolina, plaintiffs' claims do not arise out of those contacts and are too attenuated to support specific jurisdiction.  Id. at 16–19; ECF No. 40 at 3–5.

In response, plaintiffs argue that, based on the Fourth Circuit's reasoning in UMG Recordings, 963 F.3d at 353–54, defendants have purposefully availed themselves of the privilege of doing business in South Carolina by selling location-based advertising and that it is immaterial that Snap sold these ads through third-party advertisers.  ECF No. 37 at 6.  Plaintiffs assert that jurisdictional discovery is necessary to verify "[d]efendants' representations regarding data collected by Snap and the conduct of [d]efendants and any other third parties in determining where and how to direct advertisements to South Carolina."  ECF No. 37 at 6.  Further, plaintiffs note that defendants state that 0.26% of daily Snapchat users are in South Carolina, and plaintiffs calculate that this means there are at least 829,000 daily Snapchat users in South Carolina.  Id. at 6–7 (citing ECF No. 35 at 15).  Plaintiffs argue that this is an "extraordinary number of daily users" and that this shows a "substantial and continuing connection" between Snapchat and South Carolina.  Id. at 7.  Plaintiffs also contend that their claims arise out of Snap's contacts with South Carolina because, among other reasons, Snap provided the Speed Filter in South Carolina to increase its users in South Carolina and to, in turn, increase its targeted-advertising revenue from South Carolinians.  Id. at 7–8.

Additionally, plaintiffs argue that they are entitled to jurisdictional discovery both because (1) their claims against defendants are not frivolous and because (2) additional

17

information would alter the jurisdictional analysis. ECF No. 22-1 at 4–8. In response, defendants argue that jurisdictional discovery should be denied for two reasons. First, they argue that plaintiffs have failed to make the prima facie case for personal jurisdiction. ECF No. 36 at 4–6. Second, defendants argue that plaintiffs have "failed to identify any specific discovery it [sic] seeks and explain how that information would impact the jurisdictional analysis," meaning jurisdictional discovery would be futile. Id. at 4, 7–10.

### 3. Analysis

The court finds that plaintiffs have "alleged sufficient facts to suggest the possible existence of personal jurisdiction," such that jurisdictional discovery is necessary. See Pandit, 808 F. App'x at 183. Notably, plaintiffs have alleged that

> Snap collected location data and other user data from Snapchat users in South Carolina using the Speed Filter . . . ; sold advertisements targeted to Snapchat users in South Carolina . . . based on the data Snap collected from South Carolina users; and directed advertisements targeted to Snapchat users in South Carolina by way of the Snapchat platform.

Amend. Compl. ¶ 3. They also allege that Snapchat users entered into agreements with Snapchat regarding the use of their location data for commercial purposes and that Snapchat collects revenue from its advertising targeted at South Carolina users. Id. ¶¶ 4, 6. Finally, they have alleged that their claims arose from use of the Speed Filter and Snapchat's efforts to target South Carolina users. Id. ¶¶ 3–4. These facts are similar to those which were sufficient to confer jurisdiction in UMG Recordings. See 963 F.3d at 353–55.

The court finds that more information is needed before it can determine whether it has personal jurisdiction.[8]  Specifically, the Fourth Circuit based its decision in UMG Recordings on the following factual considerations: the number of visitors from the forum state in comparison to other states,[9] UMG Recordings, 963 F.3d at 353; the frequency of visitors from the forum state, id.; the commercial relationship between the defendant and the forum state, specifically whether users agreed to contractual terms giving defendants authority to collect their data, id.; whether advertising displayed on the website was directed toward the forum state, id.; whether the defendant profited by selling advertising space and collecting data for the use of third parties to specifically target the forum state, id. at 353–54; the fact that the defendant had contracted with a U.S.-based agent, U.S.-based advertising brokers, had registered with U.S.-based domain registers and had, at one point previously, relied on U.S.-based servers,[10] UMG

---

[8] Additionally, plaintiffs have not argued whether exercising jurisdiction would be constitutionally reasonable.  The court need only reach this issue if plaintiffs meet their burden on proving the first two prongs of the specific jurisdiction analysis.  See White, 519 F. Supp. 3d at 259.  Thus, if plaintiffs meet their burden of on the purposeful availment and relatedness prongs after jurisdictional discovery, the court will determine whether exercising jurisdiction in this case would be constitutionally reasonable.

[9] As plaintiffs note, defendants state that South Carolina only constituted 0.26% of users worldwide.  ECF No. 35 at 16.  While courts should not focus purposeful availment analysis exclusively on the percentages of a business's sales that took place within the forum state, those percentages and number of sales directed at the forum, when combined with other facts, can be indicative of whether the defendant directed activity at the forum.  See UMG Recordings, 963 F.3d at 353; Ctr. for Cmty. Self-Help v. Self-Fin., Inc., 2023 WL 1779831, at *5–6 (M.D.N.C. Feb. 6, 2023).

[10] The servers in question were based in Virginia in UMG Recordings, 963 F.3d at 349.  It is unclear from the opinion how much weight should be given to this consideration, especially because the analysis section of the opinion identifies these serves as "U.S.-based servers" and does not specifically mention that they were located in Virginia.  See id. at 353.  The Fourth Circuit has previously explained merely utilizing an internet server located in the forum state is not enough to establish specific jurisdiction.  Carefirst of Md., 334 F.3d at 402.  However, as it reiterated in UMG Recordings, the location of the servers can support jurisdiction when compared with other facts,

19

<u>Recordings</u>, 963 F.3d at 354; the fact that the defendant knew forum state users were accessing his products, took no action to block their access, and profited from the data harvested from those users, <u>id.</u>; and the fact that the defendant allegedly facilitated his illegality by selling advertising space and targeted user data to brokers, <u>id.</u> at 354–55.

From this and the Fourth Circuit's other internet-based-contact precedents, the court finds that jurisdictional discovery should focus exclusively on the following topics:

(1) the connection between the Speed Filter, the accident, and Snap's alleged targeted advertising, including whether the Speed Filter was accessible at the time of the accident;

(2) the number and frequency of South Carolina users and how that compares with those statistics from other states;

(3) contractual terms between Snap and South Carolina users only to the extent those terms impact Snap's ability to collect information from South Carolina users and sell that information to advertisers or brokers;

(4) the extent to which Snap collects and sells user data for the purposes of targeted location-based advertising;

(5) the extent to which advertising on Snapchat is directed toward South Carolina users;

(6) whether Snap profited from the sale of South Carolina user data and location-based advertising;

---

particularly if it shows the defendant should have anticipated being haled into court in a particular jurisdiction.  <u>See</u> <u>UMG Recordings</u>, 963 F.3d at 354 ("These facts might not be <u>individually</u> sufficient to confer specific personal jurisdiction, but when viewed in the context of other jurisdictionally relevant facts, they contradict Kurbanov's contention that he could not have anticipated being haled into court in Virginia.")

(7) the extent to which Snap directed communications toward South Carolina

users or otherwise encouraged users in South Carolina to use Snapchat;

and

(8) whether Snap uses any servers in South Carolina, maintains property in South

Carolina, employes individuals in South Carolina, or does business with

any agents or brokers in South Carolina.

If any party objects to these topics, that party may file objections within ten (10)

days of the issuance of this order, and the court will consider whether these topics should

be revised.  If, upon expiration of this ten (10) day period, no objections have been filed,

the parties shall have ninety (90) days to facilitate this discovery.  See, e.g., Clayton v.

Bear Mountain Lodge, LLC, 2015 WL 12806589, at *2 (D.S.C. Oct. 13, 2015); Spigner

v. Knight Transp. Inc., 2020 WL 3415386, at *3 (W.D.N.C. June 20, 2020), report and

recommendation adopted sub nom. Spigner v. Knight Refrigerated LLC, 2021 WL

917485 (W.D.N.C. Mar. 10, 2021).

### B.  Spiegel and White

While the court finds that plaintiffs' allegations are sufficient to proceed to

jurisdictional discovery against Snap, the court does not reach the same conclusion with

regard to plaintiffs' allegations against Spiegel or White in their individual capacities.

The court, therefore, dismisses plaintiffs' claims against these two defendants without

jurisdictional discovery.

In general, there are limited circumstances in which a corporate agent can be

subjected to specific jurisdiction based on the actions of the corporate entity.  A corporate

agent should generally be amenable to suit in a particular forum when he "takes

21

purposeful and calculated action against a plaintiff in [that] forum, fully conscious of the consequences of his actions." See Magic Toyota, Inc. v. Se. Toyota Distrib., Inc., 784 F. Supp. 306, 315 (D.S.C. 1992). In contrast,

> if the claim against [a] corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and if any connection he had with the commission of the tort occurred without the forum state, . . . under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state.

Columbia Briargate Co. v. First Nat'l Bank in Dallas, 713 F.2d 1052, 1064–65 (4th Cir. 1983).

White and Spiegel argue that plaintiffs have made no specific allegations about Spiegel or White having any connection to South Carolina and that it is too attenuated to subject a corporate officer to specific jurisdiction in South Carolina based on nothing more than the corporation's contacts with the forum. ECF No. 35 at 15–16. Spiegel and White also point to their own affidavits in which they both testify that they are domiciled in California and have never owned property or paid taxes in South Carolina. Id. at 16 (citing Spiegel Aff. ¶¶ 6–8; White Aff. ¶¶ 6–8).

In response, plaintiffs point to allegations from their amended complaint in which they accuse Spiegel and White of exercising a high degree of control over Snapchat, including by introducing the Speed Filter to users in South Carolina. ECF No. 37 at 8–10 (citing Amend. Compl. ¶¶ 5, 12, 16–18). Plaintiffs argue that these allegations are sufficient under the "guided spirit" theory of corporate officer liability. Id. at 9. In support of this argument, they rely heavily on the decision in Springs Industries, Inc. v. Gasson, 923 F. Supp. 823, 927 (D.S.C. 1996). ECF No. 37 at 9. According to plaintiffs, this theory permits courts to exercise jurisdiction over corporate officers based on a

corporation's activities when it is shown that the officers guided the corporation's activities in the forum.  Id.

The decision in Springs Industries dealt specifically with the question of whether a South Carolina court could exercise specific jurisdiction over a nonresident director of a South Carolina corporation for directing the corporation's injurious activity in South Carolina.  See 923 F. Supp. at 827.  The court explained that, even if the director did not transact business directly in South Carolina, exercising specific jurisdiction was appropriate because the plaintiff had "alleged sufficient facts to show that [the director] was involved in the decision making which [was] causally related to [the plaintiff's] injury and that [the director] was, at least in part, the guiding spirit behind the wrongful conduct."[11]  Id.  Plaintiffs' interpretation of this case would permit jurisdiction over any high-ranking corporate officer solely based on a corporation's contacts with the forum state.  This is precisely what the Fourth Circuit has instructed that district courts cannot do, as the mere fact that a defendant is a corporate officer does not relieve the plaintiff of the responsibility to allege contacts by that defendant specifically directed at the forum state.  See Columbia Briargate, 713 F.2d at 1064–65; cf. Magic Toyota, 784 F. Supp. at 315.

_____

[11] This holding was arguably dicta.  The court's primary holding was that the directors was subject to specific jurisdiction because, even if they directed the corporation from outside of South Carolina, they were considered to have made the decision in the state where the corporation is incorporated.  Springs Indus., 923 F. Supp. at 827.  Thus, regardless of where the directors made the decision, they were considered to have made the decision in South Carolina in this case.  Id.  The court then went on to explain the "guiding spirit" theory as an alternative holding supporting specific jurisdiction even if the directors did not transact business in South Carolina.  See id.

Indeed, plaintiffs' amended complaint mentions Spiegel and White in only one paragraph.  <u>See</u> Amend. Compl. ¶ 5.  In this paragraph, plaintiffs allege that Spiegel and White are corporate officers and that they "exercised a high level of control over corporate activities pertaining to the collection and sale of data from Snapchat users in South Carolina for advertising purposes, including data collected from users of Speed Filter."  <u>Id.</u>  The court finds that the allegations in this paragraph do not rise to the level of alleging "purposeful and calculated action," <u>Magic Toyota</u>, 784 F. Supp. at 315, that is directed at South Carolina and that was "causally related" to Kaiea's injuries, <u>Spring Indus.</u>, 923 F. Supp. at 827.  Instead, this is the tenuous connection between the forum state and an out-of-state corporate officer's actions that the Fourth Circuit has stated would not confer specific jurisdiction.  <u>See</u> <u>Columbia Briargate</u>, 713 F.2d at 1064–65.  As such, the court finds that plaintiffs' allegations are not sufficient to warrant jurisdictional discovery.  <u>See</u> <u>Pandit</u>, 808 F. App'x at 183; <u>see also</u> <u>Seaside Farm</u>, 842 F.3d at 860.  Therefore, plaintiffs' motion for jurisdictional discovery against Spiegel and White is denied, and defendants' motion to dismiss the allegations against Spiegel and White is granted.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DEFERS RULING ON IN PART** defendants' motion to dismiss and **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion for jurisdictional discovery.  Specifically, the court **GRANTS** leave for jurisdictional discovery against Snap and **DEFERS** ruling on defendants' motion with respect to this defendant, and the court **DISMISSES** plaintiffs'

24

claims against Spiegel and White and **DENIES** leave to conduct jurisdictional discovery

pertaining to these defendants.

      **AND IT IS SO ORDERED.**

                         **DAVID C. NORTON**
                         **UNITED STATES DISTRICT JUDGE**

**July 6, 2024**
**Charleston, South Carolina**