**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| JEREMY PAUL BATTS and SUSAN BETH BATTS *as co-personal representatives of the estate of Kaiea Springs Batts, deceased*, | ) | |
| Plaintiffs, | ) | No. 2:23-cv-03565-DCN |
| vs. | ) | **ORDER** |
| SNAP INC. *d/b/a SNAPCHAT, Inc.*, | ) | |
| Defendant. | ) | |

This matter is before the court on court on defendant SNAP Inc.'s ("Snap") motion to dismiss for lack of personal jurisdiction, ECF No. 86. Also before the court is Snap's motion to dismiss for failure to state a claim, ECF No. 87. For the reasons set forth below, the court grants the motion to dismiss for lack of personal jurisdiction and deems moot the motion to dismiss for failure to state a claim.

## I. BACKGROUND

Plaintiffs Jeremy Paul Batts and Susan Beth Batts (together, "Plaintiffs") bring this action on behalf of their deceased daughter, Kaiea Batts (the "Decedent"). ECF No. 38 ¶ 1, Amend. Compl. On June 17, 2021, Decedent was a passenger in a vehicle that crashed. Id. ¶ 17. Tragically, Decedent did not survive. Id.

Snap is a social media company that owns and operates the Snapchat application ("Snapchat"). Id. ¶ 2. Generally, Snapchat allows its users to send photos and videos to other users or to post content for many users to view. See id. ¶ 10. Snapchat allows users to customize a photo prior to sharing through "Sticker" or "Filter" features that

allow the user to overlay additional material onto the photo or alter the photo's appearance. See id. ¶ 11. Relevant here is Snapchat's Speed Filter feature (the "Speed Filter"), which allowed users to append their speed of travel onto the photo.[1] Id.

Plaintiffs allege that "at least one occupant [of the vehicle] who had previously used Snapchat Speed Filter" was "using and/or preparing to use Speed Filter immediately before" the accident. Id. ¶ 17. Plaintiffs' primary contention is that the driver was motivated to travel "at an extremely high and dangerous speed" because the driver or another occupant either was using or was about to use the Speed Filter. See id. ¶¶ 16–17. In other words, the Speed Filter's availability encourages driving at an unsafe speed—particularly in the case of younger drivers. See id. ¶¶ 14–15.

Plaintiffs filed this action on July 24, 2023. ECF No. 1, Compl. Plaintiffs filed an amended complaint on April 16, 2024, in which they assert two claims against Snap: one for negligence and another for strict liability. ECF No. 38, Amend. Compl. ¶¶ 9–22. After some procedural wrangling, the court issued an order granting jurisdictional discovery on August 8, 2024. ECF No. 51. After the close of jurisdictional discovery, Snap filed two motions to dismiss. First, Snap moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) on March 15, 2025. ECF No. 86. Later that same day, Snap moved to dismiss for failure to state a claim pursuant to

---

[1] Snap contends that starting in November 2016, it implemented a "blackout range" for Speed Filter, disabling the function at speeds between 50 and 170 miles per hour. ECF No. 35-1, Mourkogiannis Aff. ¶ 8. Then, in June 2017, it allegedly expanded the low end of the blackout range to 35 miles per hour. Id. Finally, on June 14, 2021, three days prior to the accident, Snap claims to have totally removed the Speed Filter from the application with the release of a new version of Snapchat. Id. ¶ 10. While relevant to the merits of Plaintiffs' allegations, Snap's position on the evolution of the Speed Filter is not relevant to the pending motions.

Rule 12(b)(6). ECF No. 87. Plaintiffs responded in opposition to the Rule 12(b)(6) motion on July 15, 2026, ECF No. 89, and responded to the Rule 12(b)(2) motion on the following day, ECF No. 91. Snap replied in support of its 12(b)(2) motion on August 14, 2026, ECF No. 100, and in support of the 12(b)(6) motion on August 20, 2026, ECF No. 101. The court held a hearing on the motions on September 9, 2026, at which the parties presented evidence and argument for and against exercising personal jurisdiction over Snap. ECF No. 103. As such, the motions are fully briefed and now ripe for the court's review.

## II. STANDARD

"When a court's personal jurisdiction is challenged, the burden is on the plaintiff to establish that a ground for jurisdiction exists." Gourdine v. Karl Storz Endoscopy-America, Inc., 223 F.Supp.3d 475, 481 (D.S.C. 2016). The extent of the plaintiff's burden "varies according to the posture of a case and the evidence that has been presented to the court." Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016). If the court decides the motion only on the basis "of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing" that the court can exercise personal jurisdiction over the defendant. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). In this preliminary posture, the court may consider pleadings, affidavits, and other supporting documents but, as with a Rule 12(b)(6) motion, must "take the allegations and available evidence relating to personal jurisdiction in a light most favorable to the plaintiff." Grayson, 816 F.2d at 268 (citing Combs, 886 F.2d at 676); see also Sunoco Prods. Co. v. ACE INA Ins., 877 F. Supp. 2d 398, 404–05 (D.S.C. 2012).

When the district court holds an "evidentiary hearing" on a Rule 12(b)(2) jurisdictional challenge, the plaintiff must then "establish facts supporting personal jurisdiction by a preponderance of the evidence[.]" Grayson, 816 F.2d at 268 (re-stating the requirement that the district court "must conduct an evidentiary hearing[ ]" for the preponderance of the evidence standard to apply). In the context of Rule 12(b)(2) challenges, an "evidentiary hearing" does not require live testimony; the district court need only afford both parties "a fair opportunity to present . . . the relevant jurisdictional evidence and their legal arguments." Id. (citing Fed. R. Civ. P. 43(c) (providing that court may "hear" motions "on affidavits or . . . wholly or partly on oral testimony or on depositions.")). After doing so, the preponderance of the evidence standard applies. Grayson, 816 F.2d at 268; see Sneha Media & Ent., LLC v. Associated Broadcasting Co. P Ltd., 911 F.3d 192, 197 (4th Cir. 2018) (confirming that "if the court denies a Rule 12(b)(2) motion under the prima facie standard, it can later revisit the jurisdictional issue when a fuller record is presented"); Gourdine, 223 F. Supp. 2d at 482 (applying preponderance of the evidence standard after close of jurisdictional discovery because "[i]t would be illogical . . . to allow extended discovery of jurisdictional facts and then to rule on jurisdiction based on allegations and assumptions rather than facts supported by discovered evidence."); see also Brown v. Geha-Werke GmbH, 69 F. Supp. 2d 770, 774 (D.S.C. 1999) (finding the "jurisdictional information before the court" to be "more like that presented at an evidentiary hearing" after conclusion of jurisdictional discovery).

## III. DISCUSSION

The court first considers whether it can exercise personal jurisdiction over Snap.

As an initial matter, because the September 9, 2026, hearing gave Plaintiffs "a fair opportunity to present . . . the relevant jurisdictional evidence and their legal arguments[,]" the court applies the preponderance of the evidence standard to the jurisdictional inquiry. See Grayson, 816 F.2d at 268. Accordingly, the burden falls to Plaintiffs to establish that, more likely than not, the court can exercise personal jurisdiction over Snap.

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Thus, in evaluating a challenge to personal jurisdiction, the court engages in a two-step analysis. Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). First, it must find that the forum state's long-arm statute authorizes the exercise of jurisdiction under the facts presented. Id. Second, if the statute does authorize jurisdiction, then the court must determine if its exercise of personal jurisdiction is consistent with due process. Id. South Carolina's long-arm statute extends its reach to the outer limits allowed by the Due Process Clause. Foster v. Arletty 3 Sarl, 278 F.3d 409, 414 (4th Cir. 2002); Cockrell v. Hillerich & Bradsby Co., 611 S.E.2d 505, 508 (S.C. 2005); see S.C. Code Ann. § 36-2-801, et seq. Consequently, the two-step inquiry compresses into a single question: whether the court's exercise of personal jurisdiction comports with due process. Maseng v. Lenox Corp., 483 F. Supp. 3d 360, 364–65 (D.S.C. 2020).

Personal jurisdiction over a nonresident defendant can be either specific or

general. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). General jurisdiction arises when the nonresident defendant's contacts with the forum state "are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State." Id. (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)). General jurisdiction may be exercised even when the suit is unrelated to the defendant's contacts within the forum state. See S.C. Code Ann. § 36-2-802; Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 416 (1984). Here, Plaintiffs do not argue that the court has general jurisdiction, see ECF No. 91, so the court need only address whether it has specific jurisdiction over Snap.

Exercising specific jurisdiction does not comport with due process unless the defendant has purposefully established sufficient "minimum contacts" with the forum state and the exercise of jurisdiction comports with notions of "fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76 (1985). A defendant has minimum contacts with a state when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Minimum contacts must be based on "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475. "A defendant's actions that are directed at the forum state in only 'a random, fortuitous, or attenuated way' are insufficient to support jurisdiction." ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 392 (4th Cir. 2012) (quoting ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997)). If purposeful availment is shown, those contacts must also "form

the basis of the suit," or, said differently, "the plaintiff's claims must arise out of" the defendant's forum-directed activities. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278–29 (citing Burger King, 471 U.S. at 472) (cleaned up). Lastly, a fairness inquiry balances any burden on the defendant against countervailing concerns such as the plaintiff's interest in obtaining relief and the forum state's interest in the controversy. World-Wide Volkswagen, 444 U.S. at 292.

The Fourth Circuit has synthesized the foregoing principles into a three-prong test for assessing personal jurisdiction:

> (1) the extent to which the defendant purposefully availed itself of the privileges of conducting activities in the State;
>
> (2) whether the plaintiffs' claims arise out of those activities directed at the State; and
>
> (3) whether the exercise of personal jurisdiction is constitutionally reasonable.

Consulting Eng'rs Grp., 561 F.3d at 278.

On the first prong, the Fourth Circuit looks to a list of non-exclusive factors to determine whether a nonresident defendant has purposefully availed itself of the privilege of conducting business in a forum state:

> (1) whether the defendant maintains offices or agents in the forum state;
>
> (2) whether the defendant owns property in the forum state;
>
> (3) whether the defendant reached into the forum state to solicit or initiate business;
>
> (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state;
>
> (5) whether the parties contractually agreed that the law of the forum state would govern disputes;

(6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;

(7) the nature, quality and extent of the parties' communications about the business being transacted; and

(8) whether the performance of contractual duties was to occur within the forum.

Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 560 (4th Cir. 2014) (quotation marks and citation omitted).

Traditional due process considerations apply equally to questions of internet-based contacts. ALS Scan, Inc. v. Digit. Servs. Consultants, 293 F.3d 707, 713–14 (4th Cir. 2002); Young v. New Haven Advoc., 315 F.3d 256, 263 (4th Cir. 2002). In certain circumstances, a nonresident defendant using the internet may "conceptually 'enter' " a state without crossing any borders. ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 713 (4th Cir. 2002) (cleaned up). That said, the Fourth Circuit has made clear that "a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which [an] electronic signal is transmitted and received." Id. at 714. If a defendant could be haled into a state's courts on this basis alone, "the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist," id. at 712, "and the traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted," Young, 315 F.3d at 263.

To better evaluate claims of internet-based contacts, the Fourth Circuit has "adopted and adapted" the seminal Zippo sliding scale test to assess whether internet-based conduct will allow for the exercise of personal jurisdiction. ALS Scan, 293 F.3d at 713–14 (cleaned up) (citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119

(W.D. Pa. 1997)). The sliding scale measures a defendant's internet-based contacts using a three-level spectrum:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.
>
> At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.
>
> The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

ALS Scan, 293 F.3d at 713–14 (alteration in original) (quoting Zippo, 952 F. Supp. at 1124).

The Fourth Circuit recently considered how a website's collection and sale of location data for advertising purposes fits into the specific jurisdiction analysis. See UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344 (4th Cir. 2020). The court engaged in fact-intensive analysis to determine that a Virginia court had personal jurisdiction over a Russian website developer, Tofig Kurbanov ("Kurbanov"), in a copyright infringement suit. Id. at 347–48. While residing in Russia, Kurbanov created websites that allowed users to download pirated music. Id. at 348. Kurbanov permitted access to his websites free of charge and generated revenue through the sale of advertising space on his websites. Id. He sold advertising space to ad-brokers, who in turn sold those spaces to advertisers, and some of the advertisers and brokers used location-targeting technology to

direct ads to specific geographic areas. Id. Kurbanov's websites were accessible all over the world. Id. at 349. About 10% of their traffic came from the United States, and 2% of that American traffic came from Virginia, which made Virginia one of the top thirteen states in the country in terms of number of users of the websites. Id.

Although Kurbanov never left his mother country while pirating others' music, the Fourth Circuit concluded that he had purposefully availed himself of the privilege of conducting business in Virginia. Id. at 349, 353. In reaching this conclusion, the Fourth Circuit focused on the fact that Kurbanov had created a commercial relationship with Virginia customers through his websites. Id. It was immaterial to the court that Kurbanov did not charge customers directly because he profited from collecting customer data and selling that data to advertising brokers, who used the data to facilitate geographically targeted ads. Id. at 353–54. The court rejected Kurbanov's defense that he lacked control over the advertising on his websites due to the role of third parties in the enterprise because Kurbanov earned "revenues precisely because the advertising [was] targeted to visitors in Virgina." Id. at 354.

The court identified additional connections between Kurbanov and the United States that supported the exercise of personal jurisdiction, including that he had registered an agent with the U.S. Copyright Office, "contracted with U.S.-based advertising brokers, registered his Websites with U.S.-based domain registers, and until recently relied on U.S.-based servers." Id. While the court cautioned that these contacts would not "be individually sufficient to confer specific personal jurisdiction" on a Virginia court, they were "jurisdictionally relevant" and "contradict[ed] Kurbanov's contention that he could not have anticipated being haled into court in Virginia." Id. (emphasis in original).

These contacts, the court found, showed that Kurbanov had "purposefully availed himself of the privilege of conducting business in Virginia." Id.

The second prong, requiring that the plaintiffs' claims "arise out of or relate to" Kurbanov's contact with the forum state, was easily satisfied because "Kurbanov actively facilitated the alleged music piracy through a complex web involving Virginia visitors, advertising brokers, advertisers, and location-based advertising." Id. at 355. Put simply, Kurbanov was targeting Virginians to profit from pirated music, and this was the very conduct that gave rise to the copyright infringement suit. See id.

Having laid out the framework that will govern the specific jurisdiction analysis, the court now turns to assess the first prong of the specific jurisdiction test.

**A. Purposeful Availment**

On the first prong, the question is whether Plaintiffs have shown by a preponderance of the evidence that Snap purposefully availed itself of the privileges of conducting activities in South Carolina. See Consulting Eng'rs Grp., 561 F.3d at 278. As the burden is on Plaintiffs, the court first evaluates their evidence and arguments before turning to Snap's.

**1. Plaintiffs' Evidence**

**a. Volume**

Plaintiffs first point to the sheer volume of Snapchat users in South Carolina. Over the course of June 2021, the month of the accident, Snap maintained an average of [redacted] in South Carolina, making South Carolina [redacted]

[redacted] ECF No. 91 at 7, 10 (citing Ex. 1).[2] Plaintiffs observe, and the court agrees, that [redacted] "dwarf[ ]" the half-million Virginia visitors to Kurbanov's websites over a twelve-month period—a number the UMG Recordings court deemed "plentiful." UMG Recordings, 963 F.3d at 353; ECF No. 91 at 10. Over the course of 2021, Plaintiffs allege that there were [redacted], which constituted [redacted] and ranked South Carolina at [redacted][3] ECF No. 91 at 7-8 (citing Ex. 2). Plaintiffs emphasize that that [redacted], making South Carolina the [redacted][4] ECF No. 91 at 11 (citing Ex. 6). Lastly, there were [redacted] ECF No. 91 at 11 (citing Ex. 7). Plaintiffs submit this evidence to show that "Snap directs electronic activity into South Carolina hundreds of thousands of times a day." ECF No. 91 at 7.

**b. Commercial Relationship and Targeted Advertising**

Plaintiffs then detail the commercial relationship that Snap creates with users through its Terms of Service and Privacy Policy—and how Snap profits from this

---

[2] When citing to exhibits, the court is referring to the exhibits attached to Plaintiffs' brief in opposition to Snap's motion to dismiss for lack of personal jurisdiction. See ECF No. 91.

[3] Plaintiffs provide [redacted]. Ex. 2. The court notes that the population of South Carolina in the year 2021 was approximately 5,000,000, which calls into question the accuracy of the [redacted] without additional explanation. That said, the court's analysis on the first prong does not depend on the accuracy or import of the [redacted].

[4] To avoid overstating the significance of this metric, the court notes that the range for all states is [redacted], with most states averaging to [redacted]. See Ex. 6.

arrangement. First, Snap requires all users to agree to its "Terms of Service." ECF No. 91 at 11–12 (citing ECF No. 13-1 at 4, Locascio Aff. ¶ 20). Regarding advertising, the Terms of Service state "[i]n consideration for Snap Inc. letting you access and use the Services, you agree that we, our affiliates, and our third-party partners may place advertising on the Services."[5] Ex. 9 at 177;[6] see ECF No. 91 at 12. The Terms of Service also incorporate Snap's "Privacy Policy," stating "we encourage you to give the Privacy Policy a careful look because, by using our Services, you agree that Snap Inc. can collect, use, and share your information consistent with that policy." Ex. 9 at 178 (cleaned up); see ECF No. 91 at 12. The Privacy Policy explains, under the heading "Information We Get When You Use Our Services," that Snap will, "with your permission, . . . collect information about your precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other sensors . . . ." Ex. 3 at 98; see ECF No. 91 at 12. The Privacy Policy also explains that Snap collects data on "which filters [or, stickers] you view or apply to Snaps[.]" Ex. 3 at 97; see ECF No. 91 at 12. According to the Privacy Policy, Snap collects this data to "improve our advertising services, ad targeting, and ad measurement, including through the use of your

---

[5] Plaintiffs also point to a later version of Snap's Terms of Service, which explicitly state that "these Terms form a legally binding contract between you and Snap Inc. . . . So please read them carefully." ECF No. 23-6 at 2; see ECF No. 91 at 13. The court notes, however, that these Terms of Service were not effective until August 15, 2023. ECF No. 23-6 at 2. Plaintiffs also argue that these Terms of Service "provide that Snap or its users may bring an action in court in South Carolina[,]" ECF No. 91 at 13, relying on the following language: "Notwithstanding the foregoing [arbitration clause], either you or Snap may bring an individual action in small claims court." ECF No. 23-6 at 18.

[6] Where pagination is not given in the cited exhibit, the court cites to the Bates number on the applicable page cited.

precise location information (again, if you've given us permission to collect that information)." Pls. Ex. 3 at 100; ECF No. 91 at 12.

In light of this evidence, Plaintiffs contend that Snapchat was not only being used by millions of South Carolina residents in 2021, but Snap was also entering into and maintaining "contractual and commercial relationships" with each of those "millions of . . . users." ECF No. 91 at 11–12. Plaintiffs argue that Snap collects more extensive data from its users than Kurbanov collected from website visitors in UMG Recordings. Id. at 12. The court agrees with Plaintiffs on this point. See UMG Recordings, 963 F.3d at 355 (identifying key location data metrics collected by Kurbanov as "IP addresses and country origin.").

Plaintiffs then point to Snap's 2022 Form 10-K earnings report to establish that Snapchat derives substantially all of its revenue from third party advertising. ECF No. 23-4 at 15 ("Substantially all of our revenue is generated from third parties advertising on Snapchat."); id. ("For the years . . . 2021, 2020, and 2019, advertising revenue accounted for approximately 99%, 99%, and 98% of total revenue, respectively."); see ECF No. 91 at 9. Plaintiffs observe that Snap is earning revenues using the same business model that Kurbanov employed in UMG Recordings: instead of charging Snapchat users a fee to earn revenue, Snap collects users' data and then shares that data with advertisers to sell advertisements tailored to users' preferences. See ECF No. 91 at 12; UMG Recordings, 963 F.3d at 353–54 (describing "users' acts of accessing the Websites" as "commercial relationships because Kurbanov ha[d] made a calculated business choice not to directly charge visitors . . . to lure them to his Websites.").

2:23-cv-03565-DCN Date Filed 10/28/26 Entry Number 104 Page 15 of 28

### c. South Carolina Contacts

Plaintiffs then point to evidence to establish that targeted advertising is directed towards South Carolina. Plaintiffs claim, for example, that [redacted]. ECF No. 91 at 13 (citing Ex. 10 at 3). Snap defines an "ad set" as a "group of ads within a third-party advertiser's ad campaign that shares specific audience criteria, budget, goal, and flight time, as selected by the third-party advertiser." ECF No. 12 at 2. Plaintiffs neglect to mention that the interrogatory response they cite from Snap goes on to say [redacted] Ex. 10 at 3.

Plaintiffs then use Snap's website to establish that Snap and its advertising clients can target users with advertisements on an even more granular level than a state or region. Snap's website tells advertisers, for instance, that they can target particular locations by simply "drop[ping] a pin, and search[ing] for . . . countries, regions/states, metros/DMAs, postal codes, addresses, and latitude and longitude pairs." Ex. 12 at 348; see ECF No. 91 at 13-14. Plaintiffs thus contend that Snap is likely facilitating targeted advertising directed at geographic areas exclusively within South Carolina in addition to the [redacted] that targeted larger geographic areas inclusive of South Carolina.

Plaintiffs also point to evidence that shows the revenue Snap earned from South Carolina-targeted advertisements. ECF No. 91 at 15. From 2019 to 2021, for example, Snap earned [redacted] from advertisements that targeted South Carolina as a

geographic region according to Plaintiffs.[7] ECF No. 91 at 15 (citing Ex. 10 at 4). Again, Plaintiffs neglect to mention that the preceding figure "includes revenue from advertising sets that targeted South Carolina, even if the advertisement set also targeted South Carolina and another region" like Georgia or Alabama. Ex. 10 at 4. But regardless, the fact remains that Snap is earning substantial revenue "precisely because" it directs advertisements at South Carolina users. See UMG Recordings, 963 F.3d at 354. Snap is therefore "exploit[ing]" its South Carolina "base for commercial gain by selling space on" Snapchat for advertisements. See id. (quotations marks and citation omitted). And, as the Fourth Circuit said in UMG Recordings, this relationship makes it "immaterial whether the third-party advertisers or [Snap]" chooses to target South Carolina. See id. (quotation marks and citation omitted).

Plaintiffs argue the evidence further shows that Snap provides advertisers with the tools they need to engage in targeted advertising. For example, Snap offers a "lookalike audience" tool that allows advertisers to access user data, including location data, to identify users with the same attributes, i.e., users living in the same location. Ex. 10 at 1–2. Plaintiffs also point out that "Snap bragged to investors of its ability to 'optimize [the] relevance of ads across the entire platform by determining the best ad to show to any user based on their real-time historical attributes and activity.'" ECF No. 91 at 14 (quoting ECF No. 23-4). This evidence establishes, in their view, that "Snap is not removed from the targeting apparatus[;]" rather, "Snap built and operates . . . the apparatus." ECF No. 91 at 14.

[7] Plaintiffs also point out that Snap earned [redacted] from South Carolina-based advertisers from 2019 to 2021. ECF No. 91 at 15 (citing Ex. 15 at 353).

Finally, Plaintiffs maintain that the evidence shows that "Snap utilizes an in-forum instrumentality to deliver services to South Carolina users." ECF No. 91 at 15. Plaintiffs cite to discovery where Snap represented that

[redacted]

ECF No. 86-6 at 5.[8] The UMG Recordings court considered Kurbanov's use of "U.S.-based servers" to be a jurisdictionally relevant fact, and so, the court considers Snap's use of South Carolina servers to be jurisdictionally relevant as well. See 963 F.3d at 354.

**2. Snap's Response**

Snap attempts to distinguish UMG Recordings on various grounds, none of which are persuasive. It first points to where UMG Recordings said that "[t]hese facts might not be individually sufficient to confer specific personal jurisdiction," to argue that location-based advertising alone does not ipso facto establish personal jurisdiction. ECF No. 86 at 16–17. However, the UMG Recordings used that qualification immediately after discussing Kurbanov's contacts with the United States more broadly and found those contacts relevant "when viewed in context of other jurisdictionally relevant facts," i.e., Kurbanov's location-based advertising efforts. See 963 F.3d at 353–54. So, it was Kurbanov's broader, "U.S.-based" contacts that the court cautioned may not be individually sufficient to support the exercise of specific jurisdiction—not the location-

[8] [redacted]. ECF No. 86-6 at 5.

based advertising contacts that were focal-point of the court's analysis. See id. at 352–54.

Snap also notes that, for Kurbanov's two websites, Virginia was the eleventh and thirteenth most popular state in terms of domestic visitors, while "South Carolina is not close to being among the most popular states for Snapchat users[.]" ECF No. 86 at 17. But still, South Carolina averaged approximately [redacted], which, as Plaintiffs say, "dwarfs" the roughly 695,000 Virginia users of Kurbanov's websites.[9] ECF No. 91 at 10 (citing Ex. 1). Finally, UMG Recordings considered contacts with the United States more generally, Snap argues, because Kurbanov was a Russian national. ECF No. 86 at 17. The court agrees with Snap on this point; Snap's contacts with the United States more broadly are less relevant (if relevant at all) here because Snap is a domestic entity.

After careful review of the evidence and arguments on the first prong, the court finds that the outcome of the purposeful availment inquiry is controlled by UMG Recordings. As set forth above, the evidence pertaining to location-based advertising directed to South Carolina users closely tracks, and often surpasses, the evidence that supported exercising jurisdiction over Kurbanov.[10] While Snap identifies some dissimilarities with UMG Recordings, the court finds that those differences are not

---

[9] The court does not understand Snap's argument that advertising on Kurbanov's websites was "directed towards specific jurisdictions like Virginia[,]" while advertising sets directed to Snap users in South Carolina "accounted for less than half of one percent of all United States advertising sets." ECF No. 86 at 17. Snap's advertising statistics do not show that advertising directed to South Carolina users was, somehow, directed to another state.

[10] Concerning the Zippo sliding scale, Snapchat is certainly "interactive to a degree," as was the case in UMG Recordings, making the application either "highly interactive" or "semi-interactive." See 963 F.3d at 353.

material. UMG Recordings is binding, and so the court is satisfied that Plaintiffs have shown by a preponderance of the evidence that Snap purposefully availed itself of privilege of conducting business in South Carolina through its location-based advertising efforts.

**B. Relatedness**

Turning to the second prong, Plaintiffs must show by a preponderance of the evidence that their claims "arise out of relate to" Snap's South Carolina contacts. See Ford Motor Co. v. Mt. Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021). The "essential foundation" of the second prong is a "strong 'relationship among the defendant, the forum, and the litigation.' " Ford Motor Co., 592 U.S. at 365 (quoting Helicopteros, 466 U.S. at 414)). Put simply, there must be a " 'connection' between a plaintiff's suit and a defendant's activities." Ford, 592 U.S. at 361 (quoting Bristol Myers, 582 U.S. at 264).

As a preliminary matter, Plaintiffs allege that the Speed Filter caused the accident underlying this litigation. Amend. Compl. ¶¶ 11–17, 22. Because the Speed Filter is the alleged basis for liability, it is the "genesis of the dispute[.]" See Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 304 (4th Cir. 2012). Accordingly, Plaintiffs must show that the Speed Filter arises out of or relates to Snap's activities directed at South Carolina.

**1. Evidence of Relatedness**

To demonstrate this connection, Plaintiffs first assert, without citing to the record, that Snap offers the Speed Filter feature, among others, "to encourage users to agree to share their location and tracking data with Snap." ECF No. 91 at 8. They do point to evidence establishing that the Speed Filter was only available to users who enabled

location sharing with Snap, id. at 9, 30–32 (citing Ex. 4 at 4), and then cite to the Privacy Policy to establish that Snap collects that location data, ECF No. 91 at 9, 32 (citing Ex. 3 at 98). Plaintiffs point to discovery showing that Snap collects a data point each time a user interacts with the Speed Filter, ECF No. 91 at 9 (citing Ex. 4 at 5), and again cite the Privacy Policy to establish that Snap collects data on "which filters you view or apply to Snaps," in order to "customize the content we show you, including ads[,]" ECF No. 91 at 9 (citing Ex. 3 at 97, 99–100).

Plaintiffs quote Snap's website as well, which provides that Snap tailors content for users "based on the things you like watch, so we can share ads and Stories that'll be relevant to you!" ECF No. 91 at 9 (quoting Ex. 5 at 254). By way of example, the website continues: "if you follow race car drivers, like watching Stories about new cars or racing, and visit racing websites that share data with Snap, then we might guess that you're an 'Automotive Enthusiast.' " ECF No. 91 at 9 (quoting Ex. 5 at 254). Based on this evidence, Plaintiffs claim to have shown that the Speed Filter "directly serves Snap's South Carolina advertising business[.]" ECF No. 91 at 9. Plaintiffs offer several inferences to strengthen this purported connection.

For example, Plaintiffs suggest that—because Snap retains a data point when users interact with the Speed Filter—Snap must be sharing that same data point with advertisers. See id. While not implausible, the inference is not supported by evidence. They also infer that—because the Speed Filter would not function without location sharing turned on—Snap must have designed the Speed Filter as part of a scheme to induce more users to share their location data, which Snap could then share with advertisers to earn larger profits. Id. at 31 (arguing that a "feature such as Speed Filter

that requires each user to enable . . . tracking . . . obviously serves Snap's location-based advertising business."); id. at 10 (characterizing Speed Filter as a "targeted advertising mechanism"). Again, Plaintiffs offer no evidence to support the inference that Snap designed the Speed Filter as a ploy to earn greater advertising profits.

Taking a simpler approach, Plaintiffs also argue that because users must share their location data with Snap in order to use the Speed Filter, and because Snap uses that data for location-based advertising, there is a strong connection between the two. ECF No. 91 at 31. But there is no evidence in the record suggesting that a significant number of users enabled location sharing to gain access to the Speed Filter. While it is possible that some users may have turned on location sharing only to gain access to Speed Filter, that possibility does not create a significant connection between the Speed Filter and location-based advertising. As such, this argument assumes too much.

As for Snap, it offers an alternative explanation for why users were required to turn on location sharing to use the Speed Filter—"to calculate speed." ECF No. 100 at 8. Snap takes the position that there is no connection between its advertising business and the Speed Filter, and it cites to the record to support that claim. First, it points to the affidavit of Snap's vice-president of products, who represents that "Snap has never used Speed Filter data for the purposes of targeted advertising, and Snap has never placed advertisements on the Speed Filter" ECF No. 35-1, Mourkogiannis Aff. ¶ 11. She further states that the Speed Filter "is not related to Snap's location based-advertising at all" and that Snap "has never used any information collected from the Speed Filter for use in any located-based advertising, including any location based-advertising in South Carolina." Id. (cleaned up). Snap also points to a letter produced (by Snap's counsel) in

discovery, wherein Snap "confirmed" that it "never used the Speed Filter or Speed Filter data for the purpose of targeted advertising, and Snap has never placed advertisements on the Speed Filter." ECF No. 100-1 at 3. Despite the large volume of jurisdictional discovery produced in this case, Snap maintains that no evidence has been produced indicating the Speed Filter "had any connection to any advertising on Snap." ECF No. 100 at 7.

At the hearing, Plaintiffs' counsel directed the court's attention to a document concerning Snap's efforts to make the Speed Filter unavailable at certain speeds. See Ex. 18 at 2. The header of the document states "Project: Sponsored Creative Tools" and "Impacted Teams: Sponsored Creative Tools." Id. (emphases added). The word "sponsored," Plaintiffs contend, is indicative of some connection between the Speed Filter and advertising. While the word "sponsored" might possibly suggest a potential connection between the Speed Filter and advertising, this single reference as evidence of that supposed connection is tenuous at best. Otherwise, Plaintiffs offer inferences drawn from the evidence in order to show a connection between the Speed Filter and advertising; however, they fail to produce any direct evidence that supports those inferences. The court finds the competing inference offered by Snap—that the Speed Filter required users to turn on location sharing because location information was necessary to calculate speed—more plausible than those drawn by Plaintiffs. More significantly, Snap points to direct evidence in the form of an affidavit to support its position that there has never been any connection between the Speed Filter and its advertising business, and Plaintiffs offer the court no reason to question the credibility of

the affiant. Having made a preliminary assessment of the evidence, the court turns to the parties' legal arguments on the second prong.

**2. Arguments and Application of Precedent**

Plaintiffs rely on the Supreme Court's decision in Ford Motor Co. to argue that they need not show "but for" causation between Snap's location-based advertising and the accident on the relatedness prong. ECF No. 91 at 29.

It is true that the Supreme Court rejected Ford's argument that the relatedness prong "always require[es] proof of causation, i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct." Ford Motor Co., 592 U.S. at 362. Rather, the "relate to" language of the doctrinal test, the Court held, "contemplates that some relationships will support jurisdiction without a causal showing." Id. (emphasis added).

The two plaintiffs in Ford Motor Co. suffered injuries while driving allegedly defective Ford vehicles.[11] Id. at 356. Those vehicles had arrived in the forum states due to the relocation of the vehicles' previous owners—not on account of any action taken by Ford. Id. at 357, 361. The Court concluded that the relatedness prong was still satisfied because Ford had marketed the allegedly defective vehicle models in the forum states "by every means imaginable," sold both models at 36 dealerships in one state and 84 dealerships in the other, and distributed replacement parts to dealers and independent auto shops alike. Id. at 365. These affirmative, model specific activities showed that Ford "had systematically served a market" in the forum states "for the very vehicles that

[11] The plaintiffs were driving different model cars in different states. Ford Motor Co., 592 U.S. at 356.

the plaintiffs allege[d]" to have injured them "in those States." Id. (emphasis added). Consequently, there was a strong enough "relationship among the defendant, the forum, and the litigation," to justify the exercise of personal jurisdiction over Ford in the forum states, even without a causal connection between Ford's forum-specific contacts and the plaintiffs' injuries. See id. at 365–66. But, the Court cautioned that its holding did not "mean anything goes." Id. at 362. "Relate to," the court stressed, "must incorporate real limits to adequately protect" out of state Defendants. Id.

Snap argues that Ford Motor Co. is of little use in this case because the opinion disavowed its own applicability to internet transactions. See 592 U.S. at 366 n.4 ("[W]e do not consider here internet transactions which may raise doctrinal questions of their own."); ECF No. 100 at 9. Snap also distinguishes the case factually, observing that Ford had advertised the very vehicles at issue "by every means imaginable." ECF No. 100 at 9 (quoting Ford Motor Co., 592 U.S. at 365). By contrast, it claims to have never promoted "the use of Snap generally or of the Speed Filter in particular." ECF No. 100 at 9. Snap acknowledges that it allows third party advertisers to promote their own goods and services, but it argues that those advertising efforts do "not cause or relate to someone's choice of when and how to use" Snapchat generally or the Speed Filter specifically Id.

In Ford Motor Co., there was no question that Ford's extensive forum directed activities included efforts to market, sell, and service "the very vehicles" that were allegedly defective. See Ford Motor Co., 592 U.S. at 365 (contrasting a case where "Ford marketed the models in only a different state or region."). The same cannot be said of Snap's location-based advertising efforts and the Speed Filter. Even when straining, the court cannot find concrete evidence in the record indicating that Snap's location-

based advertising efforts and the Speed Filter are connected in any meaningful way. See supra pp. 19–22. Thus, while Ford Motor Co. dispensed with the need to show causation in some cases, it did not dispense with the need to show a "strong relationship" between the jurisdictionally relevant contact and the underlying litigation altogether.[12] See 592 U.S. at 365. For that reason, Ford Motor Co. does not support the exercise of jurisdiction here.

Plaintiffs also quote Ford Motor Co. to say that personal jurisdiction is proper when a company "serves a market for a product in a State and that product causes injury in the State to one of its residents[.]" ECF No. 91 at 29 (quoting Ford Motor Co., 592 U.S. at 355). Applying that rationale to this case, Plaintiffs argue that Snap has likewise "served a market in South Carolina for Snapchat and Speed Filter," which they allege to have caused Decedent's death, thereby making personal jurisdiction proper in South Carolina. ECF No. 91 at 29–31. But, rote application of Ford Motor Co.'s holding—broadly phrased—to the facts of this case does not cure Plaintiffs' failure to demonstrate a strong relationship between Snap's location-based advertising efforts and the Speed Filter.

The court notes that while seeking to mechanically apply Ford Motor Co.'s holding, Plaintiffs persist in their efforts to link the Speed Filter to Snap's location-based advertising activities. See ECF No. 91 at 31. At the same time, Plaintiffs at least suggest

[12] The court does agree with Plaintiffs that the relevant inquiry here is not one of causation on the merits—i.e., did the Speed Filter cause the accident. ECF No. 91 at 32–33. Rather, the relevant inquiry is whether there is a connection between Snap's location-based advertising and the Speed Filter. Excusing Plaintiffs from showing merits causation, however, does not automatically mean they have satisfied their burden as to the relevant inquiry.

that Snap having "served a market" for Snapchat and the Speed Filter in South Carolina, alone, would justify the exercise of personal jurisdiction over Snap. See id. at 29 (asserting that relatedness prong is satisfied when "the (1) defendant serves a market for the product in the forum and (2) the product injures a plaintiff in the forum."). This argument, however, construes the relevant jurisdictional contact too broadly. If Snap having "served a market" for Snapchat could support the exercise of jurisdiction, then Snap would be subject to jurisdiction on the basis of Snapchat's general availability. Because Snapchat is available in any state offering an internet connection—or, every state—exercising jurisdiction on that basis alone would subvert "the traditional due process principles that limit "a State's jurisdiction over persons outside of its borders." See Young, 315 F.3d at 263. That approach, therefore, would amount to precisely the type of "anything goes" approach that Ford Motor Co. counsels against. See 592 U.S. at 362. To retain any "real limits," the relevant jurisdictional contact that must "relate to" the Speed Filter is the contact that supports the exercise of jurisdiction—that being, Snap's location-based advertising efforts. See id.; cf. UMG Recordings, 963 F.3d at 354–55 (considering whether Kurbanov's location-based advertising contacts were sufficiently related to plaintiffs' copyright infringement claims when location-based advertising was the contact that satisfied the first prong of personal jurisdiction test).

Having confirmed that Snap's location-based advertising efforts are the relevant jurisdictional contact, the court does not find persuasive evidence in the record showing a connection between those efforts and the Speed Filter that allegedly caused the underlying accident. Plaintiffs' strongest direct evidence of a connection is the document suggesting the Speed Filter a "Sponsored Creative Tool." Beyond that, Plaintiffs offer

assumptions, assertions, and inferences that, without evidentiary support, do not suffice to show a relationship between Snap's advertising efforts and the Speed Filter. See supra pp. 19–22. Snap, on the other hand, denies Plaintiffs' unsupported assertions of a connection between the two and rebuts those claims with evidence. See supra pp. 21–22. Therefore, the court cannot find that the evidentiary scale tips in Plaintiffs' favor on the second prong. Because Plaintiffs have not met that burden, the court concludes that it cannot exercise specific jurisdiction over Snap. See Consulting Eng'rs Grp., 561 F.3d at 278. Accordingly, the court will grant Snap's motion to dismiss for lack of personal jurisdiction.[13]

## IV. CONCLUSION

For the reasons set forth above, the court **GRANTS** Snap's motion to dismiss for lack of personal jurisdiction without prejudice, ECF No. 86. The court **DEEMS MOOT** Snap's motion to dismiss for failure to state a claim, ECF No. 87.

**AND IT IS SO ORDERED.**

[Signature on Following Page]

---

[13] Because Plaintiffs fail to meet their burden on the second prong of the analysis, the court does not address whether exercising personal jurisdiction over Snap would be constitutionally reasonable. Likewise, the court need not address Snap's motion to dismiss for failure to state a claim.

2:23-cv-03565-DCN Date Filed 10/28/26 Entry Number 107 Page 28 of 28



**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 14, 2026**
**Charleston, South Carolina**